Koepp, Respondent, vs. National Enameling and Stamp-
ing Company, Appellant.

*October 29—December 10, 1912.*

**(1, 19)** *Appeal: Errors, when disregarded.* (2, 3, 6, 7, 14–18) *Mas-
ter and servant: Injuries from unsafe scaffold: Assumption of
risk: Duty of master, how far absolute.* (4, 5) *Trial: Questions
for jury.* (8–18) *Statutes: Construction: Rules: "Repairing:"
"Scaffolding:" "Mechanical contrivance:"* Ejusdem generis.
(19, 20) *Excessive damages: Option to remit part.*

1. Errors will not be regarded on appeal, fatally prejudicial, unless,
   from the whole record, it appears with reasonable clearness,
   that had they not occurred the result might, probably, have
   been materially more favorable to the complaining party.
2. If a scaffolding to be used by a servant is erected by him ac-
   cording to plans dictated by the master, the contrivance is
   furnished for such use within sec. 1636—81, Stats. (Supp. 1906:
   Laws of 1901, ch. 257).
3. Whether defects in a contrivance furnished within sec. 1636—81,
   are known to the servant so as to charge him with assumption
   of the risk, is a jury question in case of there being any rea-
   sonable ground for differences of opinion in respect thereto.
4. The decision in the affirmative as to whether a question is for
   the jury, involves a determination by the trial judge, as mat-
   ter of fact, with superior opportunity to do so, that in reaching
   a final result a choice is required to be made between reason-
   ably conflicting inferences, and, on appeal, all reasonable doubts
   must be resolved in favor thereof.
5. Since an initial decision in the affirmative as to whether a mat-
   ter should be submitted to the jury involves a determination,
   as matter of fact, that, at the best for the moving party there
   is room in the evidence for a decision of the ultimate matter
   either way, in case of a wrong verdict the difficulty inheres in
   the submission.
6. Where the creation of a contrivance for use in a structural op-
   eration, involves use of expert knowledge, the master, in di-
   recting the manner of construction by his servant for the lat-
   ter's use, is responsible for the special knowledge ordinarily
   devoted to such matters, and in case of the servant performing
   the work and using the contrivance, not possessing such knowl-
   edge, that has a bearing, and may have controlling weight, on
   the question of assumption of the risk.

7. Whether sec. 1636—81 of the Statutes,—prohibiting a master from furnishing or erecting, or causing to be furnished or erected, scaffolding, hoists, stays, ladders, or other mechanical contrivances which are unsafe, unsuitable, or improper and not constructed, placed, and operated so as to give proper protection to the life and limbs of the person whom he employs or directs to perform labor of any kind in the erection, repairing, altering, or painting of a house, building, or structure,—creates absolute duty and nonperformance is not excused by exercise of ordinary care in respect to the matter, depends upon legislative intent, not legislative power.

8. The legislative purpose in enacting a law, within constitutional limitations, must prevail, regardless of judicial notions as to wisdom of the enactment.

9. All judicial rules for construction of statutes are purposed to aid in discovering the intent of the lawmakers,—to use the same to minimize the effect of a statute or enlarge it out of harmony with such intent, is illegitimate.

10. Whether legislative language should be read restrictively, or literally, or liberally, within the limits of the reasonable scope thereof, depends, very much, upon the mischiefs intended to be remedied.

11. Nothing appearing to the contrary, the rule for determining the legislative purpose is to read an enactment as reasonably as practicable in restriction of its literal meaning as regards changing the common law.

12. A radical change of conditions characterizing two legislative enactments might require one to be read restrictively and the other liberally in order to give effect to the legislative intent; in the first instance, the general rule of strict construction against changes in the common law might apply, and, in the second, be displaced by such unmistakable indications as to require the contrary reading.

13. A statute, adopted from another state, after having been there construed by its highest court, must be presumed to have been taken as construed.

14. The rule last stated applies to sec. 1636—81, Stats., first enacted in New York and construed therein as not abrogating the defense of contributory negligence or assumption of the risk, but rendering the duty of the master, incapable of being delegated and unaffected by ordinary care or caution or discretion in selecting employees or furnishing material for the creation of the particular appliance.

15. The intent of the statute to make the master an insurer of the safety of his employees in respect to the particular matter, ex-

cept in case of their own efficient assumption of the risk of contributory negligence, is within constitutional limitations.

16. The language of the statute as to "repairing" includes any work of restoration to a former more perfect condition.

17. The words "scaffolding" and "mechanical contrivance" include any contrivance made of parts erected or used for support in or about the particular kinds of work mentioned in the statute.

18. The rule of *ejusdem generis* does not apply to the words of sec. 1636—81, Stats. Each word in the series descriptive of work and of contrivance, stands by itself unrestricted by any preceding or following word, and is to be read so broadly, within reason, as to afford full relief for the condition sought to be remedied.

19. Where the trial court acts upon a motion to set a verdict aside as excessive, passing upon both the question of whether it is characterized by passion or prejudice and whether, without such element, it is too large in view of the evidence, the result will not be disturbed on appeal unless manifestly wrong.

20. Where the trial court requires a party in whose favor a verdict for damages has been rendered to remit a part thereof as a condition of judgment, the presumption will obtain on appeal, there being no unmistakable indication to the contrary, that the reduced sum was placed as low, in the judgment of the trial judge, as any other jury of fair men, properly instructed, would be liable to find on the same evidence.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge.   *Affirmed.*

Action to recover for a personal injury.

Plaintiff, an employee of defendant, fell from an eleven-foot ladder standing on a platform, raised some twenty feet above the floor of the room where the operations were in progress, and resting against a beam so as to enable him to ascend within reach of the ceiling.   The fall was caused by the supports of the platform collapsing.   He was seriously injured.   The allegations as to defendant's breach of duty were put in issue.

The evidence proved or tended to prove this: Plaintiff was injured as alleged.   He was working for defendant as a steamfitter.   He was earning, with allowances for overtime,

an average of $18 per week.   He worked under one Heath-
cote, chief engineer.   Orders were communicated from the
latter to plaintiff, through one Miller, head electrician, to
build a scaffold in the engine and electric generator room for
use in washing down the ceiling of the room and painting.
Thereupon and therefor he conveyed lumber to such room.
He purposed building a stationary platform large enough to
enable him to reach all parts of the ceiling.   Heathcote or-
dered him to build a movable platform, using two 4x4 pieces
of lumber twenty feet long standing upright, several feet
apart, against the wall with a 2x6 short plank nailed to them
about six inches below the top, and other planks supported at
one end by the cross-piece and at the other by a girder.
The two 4x4 timbers and cross-piece, put together as designed,
called in the testimony a horse, were, in use, not braced at all
nor fastened to the floor nor building.   There was nothing to
prevent the horse, so called, from collapsing under the strain
of the ladder when weighted down by plaintiff being thereon
some ten feet above the platform and at such an angle as to
naturally push out from the foot.   That happened,—result-
ing in plaintiff being so injured as to, practically, perma-
nently destroy his earning power.   He was thirty-six years
of age.

The case was submitted to the jury in five questions.   An-
swers were made to this effect: The scaffold was not so placed
and operated as to give proper protection to the life and limbs
of the person required to depend thereon for personal safety.
The insecure condition was the proximate cause of the injury.
Plaintiff was not guilty of want of ordinary care, contribut-
ing thereto.   It will require $15,000 to fairly compensate
him for damages sustained.

The court answered the first question.   Many propositions
were saved for consideration on appeal.   Upon motion chal-
lenging the verdict as excessive, the court so held, though that
it was not characterized by passion or prejudice.   Upon the

ground that the verdict expressed the honest judgment of the jury, but was so excessive as to be clearly contrary to the evidence, a new trial was ordered, contingent upon plaintiff not electing to take judgment for $4,000 less than the jury award. Such election was made and judgment rendered accordingly.

For the appellant there was a brief by *Doe & Ballhorn,* and oral argument by *J. B. Doe.*

*W. B. Rubin,* for the respondent.

MARSHALL, J. All of the many questions presented for consideration, except a few, may well be passed as involving errors, if errors at all, which were not fatally prejudicial, since it does not satisfactorily appear that, had they not occurred, the result might, probably, have been more favorable to the party complaining. That is the rule of the written law. Very likely such was the purpose of sec. 2829 of the Statutes though, it must be admitted, that until the legislative will was again unmistakably expressed by ch. 192, Laws of 1909 (sec. 3072*m*, Stats.), some fifty years after its being first proclaimed, it was. not, with perfect consistency, recognized here as going to the extent which now seems plain. As said in *Oborn v. State,* 143 Wis. 249, 126 N. W. 737, whether the later statute adds to the earlier one, it is welcomed here as a help in shaping our jurisprudence on lines which our judgment approves,—lines in respect to which, though there was, formerly, some differences as to their having been laid in the written law, such differences did not spring from any hostility to what is now regarded as beneficial.

There may be want of harmony as to what is the legislative will incorporated in a statute, yet none as to whether that will should be given its intended vitality. The former may proceed from variant angles of judicial vision or any one of several other legitimate circumstances. It is now, by the

late most emphatic expression giving direction to judicial thought, made plain that the final termination of litigation must not be delayed by errors of trial courts, however numerous and inexcusable, unless it shall appear with reasonable certainty, that, had they not occurred, the result might, probably, have been more favorable to the one complaining of them.

In no other way than the one suggested can sec. 2829, Stats. (1898), supplemented by ch. 192, Laws of 1909, in letter and spirit, be given proper place in our judicial system.   There is a presumption in every case, till evidenciarily overcome from an examination of the whole proceedings, not only against error, but, in case of error, against its being prejudicial,—that is, its affecting any substantial right of the party complaining.   To overcome such presumption there must be affirmatively,—that is evidenciarily,—a reasonably clear appearance from the record that the error, not only harmed such party, in that it might have probably changed the result; but, harmed him in a material degree.

A full appreciation of the obstacle to error being a ground for relief here will prevent many appeals which can only work harm to the one seeking relief as well as his adversary by delay and wasteful expenditure: and, also, work harm to the public at large, which at great expense maintains the instrumentalities for settling controversies of sufficient moment to be worthy of judicial cognizance.   Such appreciation will likewise cause counsel in presenting appeals to concentrate their energies on such points as are really worthy of attention, omitting the multitude of matters commonly presented for consideration.

The foregoing will explain why several questions in this case are not treated at all, and others only briefly, leaving, really, but three requiring more than mere mention, if even that.

Should the judgment have been for appellant because of

evidence conclusively establishing contributory negligence and assumption of the risk? That, first challenges attention in the order of the three major contentions made by appellant's counsel.

It is conceded that the contrivance in question was not reasonably safe. If the statute, hereafter referred to, applies, appellant must be held chargeable with having erected it. The mere manner of the use cannot be separated from that of the construction. The former was in contemplation of the latter. The platform was placed about twenty feet above the floor. A ladder, standing thereon and leaning, at or near the top, against some support, was a necessary part, since without it the workman could not efficiently reach the ceiling. So the character of construction must, necessarily, be considered with reference to that of use which was contemplated. The particular manner was found against defendant, in practical effect, in the finding as to proximate cause, if it does not appear conclusively from the evidence. So, in determining whether respondent assumed the risk or was guilty of contributory negligence, we must view the structure,—scaffold so called,—and ladder in combination, as used.

It being conceded, as indicated, and, as the fact is, that the platform was not properly constructed, was the imperfection so obvious that respondent, as an ordinary intelligent man, must be held to have known of it? He put it up; but, in doing so, acted for a superior; so the erection, to all intents and purposes, was by appellant. The whole contrivance was, in legal effect, supplied, the same as if the work were that of some person other than respondent. That is upon the theory, which the jury had a right to adopt, that respondent told the truth as to the platform having been put up and used as directed and observed by the chief engineer prior to the accident. In view of these facts, whether the imperfection in the contrivance should not have been known to respondent, is by no means entirely clear. Solved from an original stand-

point, the inclination might be in favor of appellant. The trial judge who was in closer touch with the matter than we are here, held that there was room in the evidence for reasonably conflicting inferences. If so, there was a jury question and the result cannot be disturbed whatever might be our decision, independently of the verdict. If there be error, the mischief is in the submission to the jury. They could not be expected to overrule the opinion of the trial judge by finding for appellant upon the ground that, as matter of law, there was contributory fault or assumption of risk as claimed. Jurors weigh probabilities against probabilities. Where the reasonable inferences are all one way the trial court must decide. If not before the case crosses the jury threshold, then after they have spoken. To wait for such speaking and then change the result, is to ask the jury to agree with the court and then disagree with their compliance therewith.

So the verdict, really, adds little, if anything, to the weight of the decision submitting the question under discussion as involving a conflict of reasonable probabilities. Such a decision must prevail here unless manifestly wrong. Reasonable doubts in respect thereto must be resolved in favor of the trial jurisdiction. Only in that way can the dignity be given thereto required by the written law, and which best promotes, in general, the speedy, economical vindication of right over wrong.

The proper construction of a scaffold or platform, in such a situation as that in question, may, reasonably, be said to involve more than ordinary experience. That respondent possessed such does not conclusively appear. Since expert knowledge, in some degree, may, reasonably, be said to have been required, appellant, regardless of the statute, was bound to supply it. That is, in any event, a master who is bound to supply a reasonably safe appliance for use of his servants—in case of the instrumentality involving the exercise of expert knowledge—and constructs it himself, he should do it with

such care and skill as is, in general, devoted to such matters by an ordinarily good expert.

Now assuming, as we must, that there was room in the evidence to hold, as matter of fact, that respondent did not possess the special knowledge requisite to charge him with information of the defects in the structure, and that it was as contemplated by appellant,—then there was a jury question in respect thereto as the trial court held. The element is quite significant, as the trial court doubtless thought, that the chief engineer had superior knowledge, as respondent had a right to believe, and he not only directed the manner of creating the contrivance, but saw the manner of its use, with approval by silence, and gave respondent assurance that it was perfectly safe.

So, though we confess again, the question of whether respondent was guilty of fatal fault in respect to the matter, is not free from difficulty,—that counsel had good warrant for raising and pressing that point with confidence upon our attention and for giving it significance on the appeal second only to the next question to be considered,—it does not seem sufficiently clear that the trial court was wrong to warrant overruling its decision.

Whether appellant, under common-law rules, was, clearly, actionably negligent, admits of some question. The trial court submitted the case solely upon the ground of breach of sec. 1636—81, Stats. (sec. 1, ch. 257, Laws of 1901). So, independently thereof, the verdict does not support the judgment. No presumption favorable to respondent can be indulged in as to findings having been made, on matters omitted which were essential, from a common-law standpoint, since liability was grounded on the statute and the court expressly refused to submit such omitted matters. Therefore, if the statute does not rule, the judgment must be reversed.

The statute is as follows:

"A person employing or directing another to perform labor of any kind in the erection, repairing, altering or painting of

a house, building or structure shall not furnish or erect or
cause to be furnished or erected for the performance of such
labor, scaffolding, hoists, stays, ladders or other mechanical
contrivances which are unsafe, unsuitable or improper, and
which are not so constructed, placed and operated as to give
proper protection to the life and limb of the person so em-
ployed or engaged. . . ."

Note that the duty of the employer is made positive and
emphatic. The language is somewhat unlike that treated in
*West v. Bayfield M. Co.* 144 Wis. 106, 128 N. W. 992; *Wil-
lette v. Rhinelander P. Co.* 145 Wis. 537, 130 N. W. 853; *Mc-
Ginnis v. Northern P. Mills,* 147 Wis. 185, 132 N. W. 897,
133 N. W. 22, followed by ch. 396, Laws of 1911, changing
the statute. Moreover, such statute as was thought, had
theretofore received construction in a long line of cases. So
it was viewed from a different angle than perhaps it would be
now. It seemed best to adhere to the view supposed to have
been previously taken as to the legislative purpose, especially,
since there had been many unimproved opportunities for the
lawmakers to again speak on the subject,—strongly suggest-
ing that their will had been correctly understood by the court.
It is probable that the true intent of sec. 1636*j,* Stats. (1898),
was declared here, and, in the progress of events, that the
more advanced thought was adopted which is now incorpo-
rated into sec. 1636*jj,* Stats. (Laws of 1911, ch. 396).

We must often read statutes, which are susceptible of a
double meaning, in the light of the environment characteriz-
ing their enactment, in order to determine the precise legis-
lative intent; the judicial duty and purpose being always to
give effect thereto within constitutional limitations. So in a
doubtful law, enacted at one time, the court may discover a
particular purpose as the one intended, and in such an en-
actment at a much later day to meet an entirely different con-
dition and respond to a different public sentiment, a different
purpose may seem to have been intended.

So, if for no other reasons than those given, the restrictive
meaning given in the cases cited to sec. 1636*j* of the Statutes

and similar laws does not have any great weight as to that of the one in question. It was adopted from the state of New York. It originated there by ch. 415, Laws of 1897 of that state. It was construed there in 1900, *Stewart v. Ferguson,* 164 N. Y. 553, 58 N. E. 662. The peculiar language thereof differing, somewhat, from anything in our sec. 1636*j* or sec. 1636*jj,* prior to 1911, was taken as placing upon the master a positive prohibition "without exception on account of his ignorance or the carelessness of his servants." After such construction the law was adopted here and, by a well known rule, it must be presumed that the legislature intended to adopt the construction also. So far, perhaps, as was necessary, this court followed it in *Fonder v. General C. Co.* 146 Wis. 1, 130 N. W. 884, but, without referring thereto or that the statute was of foreign origin. The first New York holding has rather been emphasized and broadened in favor of employees than otherwise, *Schapp v. Bloomer,* 181 N. Y. 125, 73 N. E. 563; *Smith v. Variety I. & S. W. Co.* 147 App. Div. 242, 131 N. Y. Supp. 1033; *Gombert v. McKay,* 201 N. Y. 27, 94 N. E. 186; *Caddy v. Interborough R. T. Co.* 195 N. Y. 415, 88 N. E. 747; *Rotondo v. Smyth,* 92 App. Div. 153, 86 N. Y. Supp. 1103, followed as binding on the federal supreme court as to a cause of action arising in New York. *Hutton v. Holdrook, C. & D. C. Co.* 139 Fed. 734. The language of the late New York cases seems to have been used with a much clearer appreciation than formerly of the broad liberal purpose toward employees which the legislature had in mind, as witness the following from *Gombert v. McKay, supra,* decided in 1911:

"It, in terms, absolutely forbids those employers to furnish or operate, or cause to be furnished or operated, any apparatus therein mentioned of the character and quality described by it. It, in its effect, provides that any employer who either personally, or by another, furnishes for the performance of any named labor a forbidden article shall be responsible therefor. The duty of the employer created by it

is personal, incapable of delegation, and unaffected by caution and discrimination in selecting employees for their prudence and competency."

Also the following from *Smith v. Variety I. & S. W. Co.,* *supra,* decided in 1911:

"The defendant is not held liable for injuries to its workmen occasioned without any fault upon its part. It was at fault in furnishing a scaffold which was not safe, as the statute required it to do. While the scaffold appeared to be safe it was, in fact, insecure. Under the law the employer became responsible for the safety of the scaffold when he directed the workmen to use the scaffold."

So it must be held that the legislature intended to make employers, in the situations dealt with by the statute, absolute insurers of the safety of their employees, save in cases of efficient assumption of the risk or contributory negligence. The legislature is presumed, as was held in New York, not to have intended to abolish those defenses though it had power to do so. *Borgnis v. Falk Co.* 147 Wis. 327, 133 N. W. 209; *Ives v. South Buffalo R. Co.* 201 N. Y. 271, 94 N. E. 431. That result was reached by construction under the old rule that the legislature will not be held to have intended to abrogate the common law where the contrary does not appear, expressly, or by very clear inference. It has, commonly, been said, an act in derogation of the common law is to be read most strictly in favor of the latter. That is not without its exceptions, as we shall see later. In general, like most other judicial rules, where the reason for it manifestly does not exist the rule does not apply.

Thus, it seems plain, the case made by the evidence is within the statute as to fault of respondent, if the structure and the work to which it was devoted were within it.

The statute, in the respects suggested, is open to construction. The field had not been covered prior to its adoption here, nor has it been since in any very satisfactory way. As

regards a rule, evolved from a general exposition of the statute, defining its limitations as definitely as practicable so as to minimize difficulty of determining whether any given case falls within it, the subject is quite open to original treatment.

It must be conceded that the full reasonable scope of the words of the law, on the side most favorable to employees, includes the general restoration of a structure, or any substantial part of it, to a proper condition, in any material particular, as for painting, and on the side most favorable to employers it stops quite short of that. In the broad liberal view, any act of restoration to a former, more perfect condition, is repairing. The only restriction heretofore made here is that it does not apply to rebuilding an entire structure. *Blount v. Janesville,* 31 Wis. 648. The New York court, Appellate Division, *Stokes v. New York L. Ins. Co.* 112 App. Div. 77, 98 N. Y. Supp. 135, inferentially, at least, held that common ordinary washing is not within "repairing," which might well be, and, cleaning, out of the ordinary, requiring the use of staging or scaffolds and ladders, especially preparatory to more important work, such as painting, with or without other design than to restore to a good or suitable condition, might be. The latter seems to be within the reasonable scope of the statute, and, perhaps, it might be given a narrower meaning in favor of employers. A reference to authorities would do little good. They would only show how the word has been construed under particular situations, none being sufficiently analogous to that in hand to be helpful. In general, they refer to the meaning commonly found in standard dictionaries,—"to restore to a good state after decay, injury, dilapidation, or destruction,"—that is to make good again an existing thing which for some reason has fallen from a former condition of suitableness,—and then determine between those broad comprehensive lines the intent of the legislature in the particular instance.

Much that has been said respecting "repairing" applies to

"scaffolding" and "mechanical contrivance." The scope thereof would reasonably include any temporary structure made·up of parts, viewing the term in its broadest scope, used for support while doing any kind of work mentioned in the law,—any kind of an elevated platform for workmen to use in the performance of their duties. Any combination for use in doing any kind of work mentioned in the statute where the servant is dependable thereon for support, in place of an ordinary surface, such as the ground or floor, is a mechanical contrivance. The legislature, in the combination of words, "scaffolding, hoists, stays, ladders or other mechanical contrivance," viewed in a broad remedial sense in favor of employees, left little, if anything, uncovered which may be used in the work mentioned, where required to be done beyond the reach of one standing on an ordinary surface.

So we face three questions, viz.:

1st. Shall we merely determine whether the particular facts here made a case within the statute, without reaching the result by a logical process of reasoning which will so clear up obscurities as to minimize, so far as practicable, uncertainties, as to what situations, in general, the statute applies to and what it does not,—just taking a step which may, in the course of time, by exclusion and inclusion, render the law reasonably easy of application, or make, now, a decision as narrow as the case?

2d. Should the statute be strictly construed, minimizing, so far as the language used will permit, its departure from the common law, as has been generally done in treating such changes of that which was adopted for this state by vote of the people in adopting the constitution?

3d. Should the law have a broad liberal construction, giving effect thereto within the boundaries of reason and the scope of the words used,—a construction giving it the amplest vitality, as a piece of remedial legislation to deal with personal injuries in the field mentioned in the act, so as to nar-

row, so far as can reasonably be done within such boundaries, the dangers of irremediable loss to employees without efficient fault on their part?

It is considered that the first question should be answered in the negative. The industry of the legislature in trying to remedy the neglect of the past to furnish employees reasonable immunity from danger of irreparable loss in case of being corporeally injured in service, evidenced by the several important acts which have recently been passed, the crowning one being the Workmen's Compensation Act, should not be so devitalized by the courts as by making for such acts as narrow a decision as practicable. True, that course, in general, is common and is the best; but, there are good exceptions and this seems to be one. The court should go, at least, far enough to make definite the viewpoint, in general, from which the scope of the law should be measured. That would be within the boundaries of the case. It would, doubtless, be in harmony with the wish of the legislature. It would be helpful to bench and bar in future cases. It would save much public and private waste. So we must decide between the rule of strict and of broad liberal construction, and let the choice determine the scope of the law.

The ordinary rule, in case of a radical departure from the common law, should not be displaced without some good reason for it. Is there such in this instance?

The basic idea of the common rule is that the legislative will should govern; the presumption being against intent to change the system adopted by a referendum to the source of power. It is no part of judicial administration to either extend or minimize the meaning of written law according to what may appear, in that field, the better policy. The legislature, within constitutional limitations, in the realm of public policy, is the supreme judge. So the strict construction which sometimes confines written law closely within its let-

ter,—even restricts that,—is applied as the way of most cer-
tainly bowing to the will of the lawmakers.   That is often
not fully appreciated.   Such want of appreciation sometimes
causes unjust criticism.   If when the law in question origi-
nated there was clearly a purpose indicated by the general
trend of legislation as to superseding the harsh common-law
rules which afforded no remediable dignity, in many situa-
tions, to injuries received by employees in the course of their
employment, then laws to that end should receive the broad
liberal construction commonly applied to legislation designed
to remedy a supposed mischief,—really that construction
commonly applied to remedial legislation.

   True, in a technical sense, such a law as the one here gives
a new right instead of a new remedy, but in the broader
sense,—in the one which forms the basis of legislative activity
in such matters,—it recognizes as a right that which was be-
fore, through a harshness of system now regarded, quite
widely, as unsuitable to modern conditions, thought to be un-
worthy of such dignity, and affords a remedy.   So in a just
and proper sense, such a law is remedial in character.

   One of the most persuasive reasons, formerly, given for
restricting the effect of legislation such as that in question, is
that, in effect, it would make employers insurers of the safety
of their employees, and that it is not to be presumed the leg-
islature would, under any circumstances, cast such a burden
upon them, and that the court should not read any such pur-
pose out of legislative action in the face of any fair way of
escape from it.   From the viewpoint of later times it has
come to be appreciated that such legislation does not, in re-
ality,—in practical effect,—transfer the losses inflicted upon
employees from them to their employers; but, merely, makes
a more direct, humane, and economical transfer thereof to the
products of labor as a natural inevitable part of the cost
thereof; thus laying the burden on consumers of the same as

insurers where, by natural and moral obligations, it belongs,—
a crystallization of economic law and moral duty into legal
obligation.

The changed public policy and sentiment from the time
when it was common, by construction, to practically, if not
actually, violate the letter of written law to preserve old limi-
tations upon rights and remedies, is no more significantly
illustrated than in our Workmen's Compensation Act. Even
the once thought magnitude of the burden of such legislation
to employers has been greatly lessened by the modern facili-
ties afforded them to insure against the risk. Such oppor-
tunities being open and readily enjoyable by employers, if
they do not embrace them, the failure has a cast of negligence
on their part, or voluntary assumption of risk.

Thus the ground for former supposition, as to unreason-
ableness, hence reason for restricting the scope of the legis-
lation by construction in order to shape it to the will of the
people, has been substantially removed by modern develop-
ment. That illustrates the danger of adhering, strictly, to
the adjudicated meaning of a legislative collection of words
in the field of police legislation, when it depends upon con-
struction, and of adhering, strictly, regardless of lapse of
time, to what is reasonable and what, destructive legislation in
such field. The absurd, oppressive, and illegitimate, viewed
in the environment of one age, may be reasonable and legiti-
mate,—even demandable by the moral standards of another
through a mere change of conditions. So, in this case, the
reasons for the strict construction of the legislation in favor
of subsistence of the common law have been eliminated to
such extent, that what still remains may be of little weight as
compared with the importance of fully remedying the mis-
chiefs the lawmaking power legislated against, and so, form
no appreciable obstacle to giving greater effect than formerly,
as to such legislation, to the words of the law which, in their
letter, make employers the primary stepping stone of personal

injury losses by accidents to their servants to the consumers in general, which the legislature has by several recent expressions of its will shown a disposition to accomplish as fully and as fast as practicable.

In addition to the Workmen's Compensation Law there is ch. 254, Laws of 1907, and are several others of a significant character, showing decided change of public policy,—some following closely restrictive decisions of this court, required, as was thought, by a settled prior construction of legislation of a similar character, radically remedying such construction by new enactments,—notably ch. 396, Laws of 1911, wherein it is provided that the duty to guard against danger to employees created by sec. 1636$j$ and sec. 1636$jj$ "shall be absolute" and "the exercise of ordinary care on the part of the employer shall not be deemed a compliance with such duties," supplementing the latter section, practically abolishing the defense of assumption of the risk.

The circumstances mentioned and others which might be referred to,—notably the general trend of legislation throughout the land and strong public sentiment evidenced in many ways for the creation of a system which will reasonably protect employees from the dangers incident to their service; abrogating as far as practicable the evidence of "man's inhumanity to man," evinced in the old system, which, though of judicial creation and development, originally, became the law of our state, as before indicated, by referendum to the people in the adoption of that part of the constitution found in sec. 13, art. XIV, in the words:

"Such parts of the common law as are now in force in the territory of Wisconsin, not inconsistent with this constitution, shall be and continue part of the law of this state until altered or suspended by the legislature,"—

unmistakably indicate, as it seems, that to apply the common rule of construction of legislative enactments in derogation of the common law to that in question, would go counter to the

legislative will. We may properly emphasize, in passing, that responsibility for objectionable features in the law of negligence does not, to any great extent, at least, lie at the door of the court. The remedy within the broad lines of constitutional limitations has been with the lawmaking power from the start. An awakening there was the thing required and, perhaps, it did not come too soon. Had it occurred sooner, there would, probably, have been far less complaint of that which was powerless to furnish a remedy. It could only, with courage requisite to full performance of duty, deal with the law as given and wait for the needed changes indicated by advanced human sentiment of the day and required by modern industrial conditions, stepping, justifiably, it is thought by the writer, from time to time, aside to stimulate activity where only that could be efficient.

Applying to the statute the broad liberal rule suggested, and appreciating the mischiefs it was intended to remedy, both the kind of work and contrivance in question are fairly within it. The plain purpose is inconsistent with such fine distinctions as that between a structure in a room and one outside of a building, or that between a platform six feet above a floor and one at a greater height, suggested in *Schapp v. Bloomer,* 181 N. Y. 125, 73 N. E. 563, and that between a place and an appliance, making a scaffold the latter and so not within the safe-place rule, as in *Butler v. Townsend,* 126 N. Y. 105, 26 N. E. 1017; *Kimmer v. Webber,* 151 N. Y. 417, 45 N. E. 860, the latter being said in *Caddy v. Interborough R. T. Co.* 195 N. Y. 415, 88 N. E. 747, to have been displaced by the law, which was adopted here, and the former practically rejected as out of harmony with the legislative purpose; that the rule of *ejusdem generis* does not apply to restrict the meaning of any of the descriptive words in the law.

So the word "repairing" stands by itself, in practical effect.

It is not to be restricted by anything which precedes it or follows it. The same is true of the term "scaffolding" and the words "mechanical contrivance." Each is to be given the broad comprehensive meaning necessary to accomplish the manifest purpose of the act. Both the work and the structure or contrivance may be as well inside a building as outside and the particular distance above the floor or ground is not material so long as the work and the contrivance answer fully to the calls of the law.

The result is that the trial court was right in holding that the case made by the evidence was clearly within the statute and submitting to the jury only the questions concerning the claimed fault of respondent and the damages.

Was there error in not requiring respondent to submit to a greater reduction of the jury award? That is the only remaining question, deemed of sufficient importance to require special attention.

Personally, I think the reduction should have been greater, but I am content with merely stating my position and the effect of the recovery in justification thereof, which I may properly do here, while confessing the logic of the prevailing view and endeavoring to support it, impersonally, with as much fidelity as if it were my own.

The respondent was a young man, only thirty-six years of age, of good health, and above the average in earning capacity, which was about $864 per year. The jury had a right to believe, from the evidence, that his earning power was practically destroyed. The details need not be stated. His capacity to move about and enjoy life is permanently greatly impaired. There was much pain and suffering, but that, as appears, will not continue to any great degree. The injury was to the limbs. There has been a recovery so that he will probably be able to permanently move about by the aid of a cane or other usual support in case of such defects. He will

probably be able to earn something, though not in his former vocation or in any manual labor requiring much exertion. He was paid, after the injury, as matter of favor, $567.56 as wages, and his expenses for hospital, ambulance, and doctor's services were assumed by appellant. It is presumed, since the contrary, in the judgment of the court, does not clearly appear, that the jury award was reduced in observance of the legal standard under the circumstances, viz.: to the lowest amount which in any reasonable probability, another jury of fair men, properly instructed, would find on the same evidence,—recognizing, efficiently, appellant's right to a jury trial in respect to the matter. *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 80 N. W. 644; *Secard v. Rhinelander L. Co.* 147 Wis. 614, 133 N. W. 45. It affirmatively appears, also, that consideration was given to whether the verdict was too large, independently of any illegitimate influence, and that the jury were acquitted of having been actuated by passion or prejudice. The award was treated as their honest judgment, but unreasonably large, nevertheless. To cure that and at the same time, in practical effect, give appellant the benefit of a jury award, a reduction from $15,000 to $11,000 was thought necessary.

So, in the legal aspects, the course of the trial court to the result reached, is faultless. Manifestly, the judge had a far better opportunity of determining the matter than is possessed here; he not only having seen and heard the witnesses, but, particularly, had opportunity to observe respondent. In such circumstances it requires a very strong case of excessiveness to warrant disturbing the judgment. While the recovery seems quite large, it is not thought to involve such clear mistake of judgment as to satisfy the rule suggested. It is probably equal to a life annuity for respondent of about $600 per year. Or, as it is thought, around three fourths of his former earning power. That is to balance capacity to engage

in gainful occupations and other elements proper to be considered. It is in that view, that this court does not see its way clear to disturb the trial decision, though, as said before, the writer inclines to the opinion that the recovery should have been lessened considerably more.

*By the Court.*—The judgment is affirmed.

KERWIN, J. (*concurring*). The opinion of the court takes a broad range, and occupies a field, in my opinion, far beyond that necessary to the decision of the case. I concur in the conclusion reached that the judgment should be affirmed, but do not subscribe to all that is said in the opinion.

TIMLIN, J. I concur in the result in this case, but there are many things said in the opinion not necessary, I think, to the decision of the case, which appear to me rather startling and to which I am not prepared to assent. I never believed that "in a doubtful law enacted at one time the court may discover a particular purpose as the one intended, and in such an enactment at a much later date to meet an entirely different condition and respond to a different public sentiment a different purpose may seem to have been intended." Industrial, economic, or social conditions existing at the time of the passage of a law may affect its construction and meaning, but public sentiment may not do so. Nor can I assent to the saying that the legislature intended to make employers in the situations dealt with by this statute absolute insurers of the safety of their employees save in cases of assumption of risk or contributory negligence; nor that the statute law should be construed, explained, and declared by the court in advance of cases presenting such questions for adjudication. Neither do I approve of this swing from one extreme to the opposite. Nor can I agree with reference to the statute in question that "the field has not been covered prior to its adoption here nor

has it been since in any very satisfactory way." *Fonder v. General C. Co.* 146 Wis. 1, 130 N. W. 884, was quite satisfactory to me although it did not attempt to "cover the field." That was one reason why it was satisfactory.

BARNES, J. (*concurring*). I concur in the result. I do not indorse all that is said by way of discussion in the opinion.