CITY OF MILWAUKEE, Appellant, vs. MILLER and another, Respondents.

*October 11—October 28, 1913.*

*Master and servant: Workmen's Compensation Act: Construction: Medical and surgical treatment: When chargeable to employer: Amount: Burden of proof: Opinion evidence: Weight: Excessive award: Notice of need for treatment: Right of employer to furnish: Expense for nurse, when allowable: Services rendered by member of family.*

An employee, in the course of his service, received an injury to a great toe. Without notice to the employer of his needing medical and surgical treatment and desiring to have such employer furnish the same, the employee procured such treatment, lasting ninety days. Notice was not given the employer at any time, except that the employee claimed compensation for his loss. Thereafter the former tendered the latter services of a competent physician and surgeon, but the latter chose to continue to be treated by the person of his choice who was assisted by the employee's niece. She voluntarily and without promise or expectation of compensation, acted as nurse. In due course the Industrial Commission awarded reparation for the loss, including $222 for medical and surgical treatment and $32 for services of the nurse.,

Principles of secs. 2394—1 to 2394—71, Stats. 1911 (Workmen's Compensation Act), apply as follows:

1. By the logic of the Workmen's Compensation Act personal injuries to employees are a natural element in the cost of production and are necessarily paid by the consumers of the things produced.

2. The Workmen's Compensation Act is to minimize personal injury distress and loss and so the burden upon the public as well as on the person injured, recognizing that such loss as legitimately enters into the cost of production as wages.

3. In construing a statute which is referable to the police power and was originated to promote the common welfare, supposed to be seriously jeopardized by the infirmities of an existing system—the conditions giving rise to the law, the faults to be remedied, the aspirations evidently intended to be embodied in the enactment, and the effects and consequences as regards responding to the prevailing conception of the necessities of public welfare, should be considered and the enact-

ment given such broad and liberal meaning as can be fairly read therefrom so far as required to effectively eradicate the mischiefs it was intended to obviate.

4. Proper administration of the Workmen's Compensation Act requires appreciation of the 'manifest legislative purpose to abolish the common-law system regarding injuries to employees as unsuitable to modern conditions and conceptions of moral obligations, and erect in place thereof one based on the highest present conception of man's humanity to man and obligations to members of the employee class,—one recognizing every personal loss to an employee, not self inflicted, as necessarily entering into the cost of production and required to be liquidated in the steps ending with consumption.

5. In dealing with a personal injury claim under the Workmen's Compensation Act, the logic and makeweights formerly supposed to justify penalizing employers as wrongdoers, to the ultimate expense of consumers, should not be allowed to play any part; but the directly responsible party should be regarded as standing for the aggregate of consumers and joining with the injured person in submitting to the sound judgment of impartial administrators the question of how much, under all the circumstances, by legislative standards, should the public be burdened as a reparation to such person or his dependents for his or their loss.

6. The amount allowed for reasonable expenses of medical and surgical treatment should be the fair value of the service as 'such,—neither more nor less because of the employer being liable therefor.

7. The burden of proof to establish to a reasonable certainty the reasonableness of charges for medical and surgical treatment under the Workmen's Compensation Act, is on the employee; and, in case of the proof being insufficient, the claim should be reduced sufficiently to cure the infirmity.

8. The reasonableness of an employee's claimed expenses reasonably incurred for medical and surgical treatment being disputed by credible evidence and not supported other than by opinion evidence of the person most interested, the trial tribunal should apply ordinary common sense and experience to the matter—not being bound or necessarily efficiently influenced by the verification by such interested one—and fix the allowable amount at such sum as appears to it to be reasonable; and where the claim is obviously exorbitant, should not allow it, in the whole, regardless of how strongly supported by evidence from the mouth of the interested party.

9. The right of the employer under the Workmen's Compensation

Act to furnish reasonably necessary medical and surgical treatment, and creating liability to the employee for reasonable expense incurred by him, or in his behalf, in that regard, in case of the former unreasonably neglecting or refusing to make the proper provision, by necessary implication reserves to the employer, under ordinary circumstances, reasonable opportunity to exercise the privilege, and renders competency of the employee to obtain such treatment, or for the same to be obtained in his behalf, at the expense of the employer, contingent upon such opportunity having been accorded.

10. The privilege accorded the employer, as stated, requires, as an incident, reasonable time to exercise it after notice of the need therefor.

11. The stated rules do not militate against competency of an injured employee to obtain medical and surgical treatment at the expense of his employer in the interim between the happening of the injury and time for notice to the employer of the employee's needs.

12. Competency of an injured employee to procure medical and surgical treatment, or for such to be procured in his behalf, at the expense of the employer, under the Workmen's Compensation Act, exists for the reasonable time after the injury, required for such employee to afford the employer opportunity to exercise his privilege; it is then suspended if the employer exercises such privilege, but revives and relates back to the time of suspension, if necessary, if the employer unreasonably neglects or refuses to exercise such privilege.

13. The legislative idea in the Workmen's Compensation Act is that an employer is so specially interested in his injured employee being restored as soon as practicable, as to be most likely to provide proper medical and surgical treatment, and the letter and spirit of the law require that such beneficial and manifestly economic phase of the enactment should be given its intended dignity.

14. The law does not cast upon employers the duty of active vigilance to discover cases of personal injury to their employees, but casts upon the latter such vigilance as they can reasonably exercise to bring such injuries to the attention of employers with their need and desire for medical and surgical treatment to be provided.

15. Expense for services of a nurse, as such, is not allowable against the employer for the period of ninety days after the injury, or at all during such period, except as a part of reasonably necessary medical and surgical treatment, proved to be such by the physician and surgeon in attendance.

16. Expense for services of a nurse, as such, after the first ninety
    days is not chargeable to the employer, nor at all thereafter
    except by allowance of the maximum percentage of disability
    indemnity.

17. The common rule in the law of negligence that the wrongdoer
    cannot mitigate his liability by taking advantage of relief
    furnished by one's wife, family, friends, or otherwise, has no
    application to cases under the Workmen's Compensation Act.
    That eliminates all penalizing features and limits compensa-
    tion to the injured person, aside from indemnity disability,
    to expenses or liabilities actually incurred.

18. The legislative requirement that the employer shall bear the
    burden of reasonably necessary medical and surgical treat-
    ment of his injured employee, was not intended as a charity
    to one, or as a penalty as to the other, but as the recognition
    of the economic truth that such expense is a legitimate ele-
    ment in the cost of production and should be placed upon the
    product as directly as practicable, using the employer as a
    necessary first step in that regard.
       [Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Dane
county: E. RAY STEVENS, Circuit Judge. *Modified and af-
firmed.*

The *Industrial Commission,* in due course, awarded *Henry
Miller,* under the provisions of the Workmen's Compensation
Act, on account of a personal injury to him which occurred
while he was in the performance of his duties as an employee
of the city of *Milwaukee,* $222 for physician's services, $32
for expense incurred for services of a nurse, $5 paid out for
bandages and supplies, and $172.50 for disability indemnity.
An action was brought in the circuit court for Dane county to
test the decision as to the first two items, resulting in the
award of the *Commission* being sustained.

One of *Miller's* great toes was severely injured by a road
roller. The member was so lacerated and the bone known
as the first digit so badly crushed that amputation became
necessary. The wound becoming somewhat infected, recov-
ery was slow because thereof and the man's age and condi-
tion of health. He resided in the house with two relatives, a

niece and her mother. The former acted voluntarily as nurse, and without promise or expectation of compensation. *Miller* did not, at any time, notify the municipality of his needing services of a physician or nurse, or give the corporation any opportunity to furnish such services. He did not notify it of his injury until October 21, 1912, three weeks after it happened. The notice then given was in the ordinary form for claiming compensation for his loss. He called Dr. Bradstad to treat him on the day of the injury. The amputation took place eleven days thereafter. November 17th, after the city received the notice aforesaid, it voluntarily tendered *Miller* the services of Dr. Carroll, a competent physician. Notwithstanding such tender *Miller* continued to employ Dr. Bradstad. From the time of such tender to the end of Dr. Bradstad's period of service, *Miller* knew that the city was ready at any time to furnish him with the services of a physician. He unnecessarily retained Dr. Bradstad for the full period of ninety days. The latter, in his bill as allowed by the *Commission,* charged for a visit to the patient and dressing of his injured member on some 135 occasions during ninety days, as indicated by the following copy of such bill:

| | | | | | |
|---|---|---|---|---|---|
| October | 1, 1912. | Surgical dressing and amp. redundant tissue | $2 | 50 |
| " | 2, | " | Dressing | 1 | 50 |
| " | 2, | " | " | 1 | 50 |
| " | 3, | " | " | 1 | 50 |
| " | 4, | " | " | 1 | 50 |
| " | 4, | " | " | 1 | 50 |
| " | 5, | " | " | 1 | 50 |
| " | 6, | " | " | 1 | 50 |
| " | 7, | " | " | 1 | 50 |
| " | 8, | " | " | 1 | 50 |
| " | 9, | " | " | 1 | 50 |
| " | 10, | " | " | 1 | 50 |
| " | 11, | " | " | 1 | 50 |
| " | 11, | " | Amputation of toe | 30 | 00 |
| " | 11, | " | Anesthetic | 5 | 00 |
| " | 12, | " | Call | 1 | 50 |
| " | 12, | " | " | 1 | 50 |
| " | 13, | " | " | 1 | 50 |
| " | 14, | " | " | 1 | 50 |

Milwaukee v. Miller, 154 Wis. 652.

| | | | | | |
|---|---|---|---|---|---|
| October | 15, | 1912. | Dressing | ...................... | $1 50 |
| " | 15, | " | " | ...................... | 1 50 |
| " | 16, | " | " | ...................... | 1 50 |
| " | 16, | " | " | ...................... | 1 50 |
| " | 17, | " | " | ...................... | 1 50 |
| " | 17, | " | " | ...................... | 1 50 |
| " | 18, | " | " | ...................... | 1 50 |
| " | 18, | " | " | ...................... | 1 50 |
| " | 19, | " | " | ...................... | 1 50 |
| " | 19, | " | " | ...................... | 1 50 |
| " | 20, | " | " | ...................... | 1 50 |
| " | 20, | " | " | ...................... | 1 50 |
| " | 21, | " | " | ...................... | 1 50 |
| " | 21, | " | " | ...................... | 1 50 |
| " | 22, | " | " | ...................... | 1 50 |
| " | 22, | " | " | ...................... | 1 50 |
| " | 23, | " | " | ...................... | 1 50 |
| " | 23, | " | " | ...................... | 1 50 |
| " | 24, | " | " | ...................... | 1 50 |
| " | 24, | " | " | ...................... | 1 50 |
| " | 25, | " | " | ...................... | 1 50 |
| " | 25, | " | " | ...................... | 1 50 |
| " | 26, | " | " | ...................... | 1 50 |
| " | 26, | " | " | ...................... | 1 50 |
| " | 27, | " | " | ...................... | 1 50 |
| " | 27, | " | " | ...................... | 1 50 |
| " | 28, | " | " | ...................... | 1 50 |
| " | 28, | " | " | ...................... | 1 50 |
| " | 29, | " | " | ...................... | 1 50 |
| " | 29, | " | " | ...................... | 1 50 |
| " | 30, | " | " | ...................... | 1 50 |
| " | 30, | " | " | ...................... | 1 50 |
| " | 31, | " | " | ...................... | 1 50 |
| " | 31, | " | " | ...................... | 1 50 |
| November | 1, | " | " | ...................... | 1 50 |
| " | 1, | " | " | ...................... | 1 50 |
| " | 2, | " | " | ...................... | 1 50 |
| " | 2, | " | " | ...................... | 1 50 |
| " | 3, | " | " | ...................... | 1 50 |
| " | 3, | " | " | ...................... | 1 50 |
| " | 4, | " | " | ...................... | 1 50 |
| " | 4, | " | " | ...................... | 1 50 |
| " | 5, | " | " | ...................... | 1 50 |
| " | 5, | " | " | ...................... | 1 50 |
| " | 6, | " | " | ...................... | 1 50 |
| " | 6, | " | " | ...................... | 1 50 |
| " | 7, | " | " | ...................... | 1 50 |
| " | 7, | " | " | ...................... | 1 50 |
| " | 8, | " | " | ...................... | 1 50 |
| " | 8, | " | " | ...................... | 1 50 |
| " | 9, | " | " | ...................... | 1 50 |
| " | 9, | " | " | ...................... | 1 50 |
| " | 10, | " | " | ...................... | 1 50 |
| " | 10, | " | " | ...................... | 1 50 |
| " | 11, | " | " | ...................... | 1 50 |
| " | 11, | " | " | ...................... | 1 50 |

Milwaukee v. Miller, 154 Wis. 652.

| | | | | |
|---|---|---|---|---:|
| November | 12, | 1912. | Dressing | $1 50 |
| " | 12, | " | " | 1 50 |
| " | 13, | " | " | 1 50 |
| " | 13, | " | " | 1 50 |
| " | 13, | " | " | 1 50 |
| " | 13, | " | " 11:30 p. m. Temp. 103.. | 1 50 |
| " | 14, | " | " | 1 50 |
| " | 14, | " | " | 1 50 |
| " | 15, | " | " | 1 50 |
| " | 15, | " | " | 1 50 |
| " | 16, | " | " | 1 50 |
| " | 16, | " | " | 1 50 |
| " | 17, | " | " | 1 50 |
| " | 17, | " | " | 1 50 |
| " | 17, | " | " Dr. Carroll called...... | 1 50 |
| " | 18, | " | " | 1 50 |
| " | 18, | " | " | 1 50 |
| " | 19, | " | " | 1 50 |
| " | 19, | " | " | 1 50 |
| " | 20, | " | " | 1 50 |
| " | 20, | " | " | 1 50 |
| " | 21, | " | " | 1 50 |
| " | 21, | " | " | 1 50 |
| " | 22, | " | " | 1 50 |
| " | 22, | " | " | 1 50 |
| " | 23, | " | " | 1 50 |
| " | 24, | " | " | 1 50 |
| " | 24, | " | " | 1 50 |
| " | 25, | " | " | 1 50 |
| " | 26, | " | " | 1 50 |
| " | 26, | " | " | 1 50 |
| " | 27, | " | " | 1 50 |
| " | 28, | " | " | 1 50 |
| " | 29, | " | " | 1 50 |
| " | 29, | " | " | 1 50 |
| " | 30, | " | " | 1 50 |
| December | 1, | " | " | 1 50 |
| " | 2, | " | " | 1 50 |
| " | 3, | " | " | 1 50 |
| " | 4, | " | " | 1 50 |
| " | 6, | " | " | 1 50 |
| " | 6, | " | " | 1 50 |
| " | 7, | " | " | 1 50 |
| " | 8, | " | " | 1 50 |
| " | 10, | " | " | 1 50 |
| " | 12, | " | " | 1 50 |
| " | 14, | " | " | 1 50 |
| " | 17, | " | " | 1 50 |
| " | 19, | " | " | 1 50 |
| " | 21, | " | " | 1 50 |
| " | 24, | " | " | 1 50 |
| " | 26, | " | " | 1 50 |
| " | 31, | " | " | 1 50 |

$222 00

November 30th after the tender of services of Dr. Carroll, the city caused written notice to be served on *Miller* that it would not pay for services of any physician except those rendered by its own selection. Dr. Bradstad verified the reasonableness of his bill. Dr. Carroll, under oath, condemned it, saying that $50 to $75 was ample for such a case. The *Commission* regarded Dr. Bradstad's charges quite large, but accepted his evidence as sufficient to sustain his claim, notwithstanding the evidence of Dr. Carroll, since, as it viewed the matter, the injury was quite serious and Bradstad, because of greater experience than Dr. Carroll, was the best judge of the matter.

For the appellant there was a brief by *Daniel W. Hoan,* city attorney, and *W. H. Timlin, Jr.,* first assistant city attorney, and oral argument by *Mr. Timlin.*

For the respondent *Industrial Commission of Wisconsin* there was a brief by the *Attorney General* and *Byron H. Stebbins,* assistant attorney general, and oral argument by *Mr. Stebbins.*

MARSHALL, J.   This appeal presents a very important question of fact and several of statutory construction. Their significance is not measured, merely, by effect of their solution in the particular instance. Such solution will probably materially affect many present and, necessarily, many future situations with which the *Industrial Commission* will have to deal. It may affect the integrity of the law itself as regards whether the beneficent purposes for which it was originated shall be realized.

A law, however much needed for the promotion of the public welfare, and however wisely framed, may be made so unsatisfactory by the spirit of it not sufficiently pervading its administration, as to largely defeat its purpose and create danger of its abrogation and a return to the distressing situation which gave rise to the effort for relief. Any such re-

sult in the particular instance would be such a public calamity that every one in authority having to do with determining the precise scope of the law, in letter and spirit, and applying it, should be alert, at all times, to the importance of not affording any reason to attempt such result and of making the wisdom embodied in the legislation so significant that no considerate person will indulge the thought of even a partial backward step toward the old system, characterized by incalculable waste, to the detriment of every consumer of the products of human energy; by distressing unequal distribution of misfortunes incident to necessary industrial pursuits, particularly misfortunes to employees by personal injury losses; by a lowering tendency of moral standards in the making and enforcing claims for such losses, and by perversion of human perceptions of individual responsibility in such cases. ( The law is a long step towards an ideal system requiring every consumer of any product of human industry, as directly as practicable, to pay his ratable proportion of the fair money cost of those things which he necessarily, or reasonably, destroys in conserving his life and welfare,—personal injury losses, not intentionally incurred,—losses whether through the fault of the employer or employee, or without fault of either, being considered as legitimately an element of such fair money cost as expenditures for raw material, for machinery or wages.

The foregoing seems legitimate as indicating the atmosphere, so to speak, in which the questions here presented, especially those of statutory construction, should be examined. The conditions giving rise to a law, the faults to be remedied, the aspirations evidently intended to be efficiently embodied in the enactment, and the effects and consequences as regards responding to the prevailing conceptions of the necessities of public welfare, play an important part in shaping the proper administration of the legislation. In the aggregate, they sometimes shed very efficient light in aid of clearing up ob-

scurities as to the legislative intent. The administrative commission and the courts should fully appreciate that and be imbued with and guided by the manifest intent of the law to eradicate, utterly, the injustice to employers and employees, and the public as well, of the old system, and to substitute in its place an entirely new one based on the highest conception of man's humanity to man and obligation to industry upon which all depend; recognizing the aggregate of its attending accidents as an element of cost to be liquidated and balanced in money in the course of consumption,—a system dealing with employees, employers, and the public as necessarily mutual participants in bearing the burdens of such accidents, displacing the one dealing only with the class of injuries happening through inadvertent failure, without real moral turpitude, to exercise average human care, and placing employee and employer, whose interests are economically the same, in the false position of adversaries, to the misfortune of both and the public, intensified by opportunity for those concerned as judicial assistants to profit by such misfortunes. Most lamentable it will be, if this new system—so freighted with hopes for the minimizing of human burdens and their equitable distribution—shall not endure and be perfected to the best that human wisdom can attain.

In the light of the foregoing it would seem that such a situation as the one presented by the claim for physician's services in this case should be viewed with eyes blinded, so to speak, to the competency of the party claimed of to pay and without a thought that the latter can legitimately be mulcted as a wrongdoer, in the moral sense, or should be required to pay more or less according to wealth, situation, or status. Results should not afford any good reason for apprehending that those influences popularly supposed to formerly have unduly characterized recoveries by jury interference still play an efficient part. The directly responsible party should be regarded as voluntarily joining with the injured person in

submitting to the sound judgment of impartial men the question of how much, under the circumstances, by legislative standards, should be rendered by one to the other as reparation for his loss.

/ Manifestly, in case of a claim such as the one in question, the amount allowed should not be more merely because of a municipality being directly responsible than in case of the person treated having to bear the burden.    What services were reasonably necessary and what is a fair compensation therefor, are the only legitimate inquiries.    In case of grave doubts as to the amount and the truth of the matter resting, as here, solely on the word of the interested party, opposed by the evidence of another competent to testify and of little or no interest in the result, there should be much hesitation, and generally refusal, to resolve it wholly against the party from whom the recovery is sought.    The burden of proof should be regarded as on the claimant to establish his claim with reasonable certainty, and circumstances or evidence impairing such certainty should incline triers to reduce the amount claimed sufficiently to place it safely within the boundaries \of reason.

Viewing Dr. Bradstad's claim as above indicated, it so shocks our common sense and standard of what is reasonable and fair as to leave no room for approving the *Commission's* finding, though confirmed by the circuit court.    We are constrained to think that the matter was not viewed, either in the first instance or on review in the circuit court, from precisely the angle above indicated.    It seems preposterous that an injury to a great toe, even of such severe nature as to require amputation and careful attention for some days to eradicate or prevent infection and create proper conditions for recovery, could reasonably require over one hundred and thirty visits and dressings during a period of ninety days, notwithstanding the presence of an attendant competent and willing to carry out the physician's directions as to caring for

the injured member.  In looking over the Bradstad claim as it appears in the statement of facts, one can but marvel that it was exhibited to such a board as the *Industrial Commission* for approval, especially with any thought of its being allowed in full.

It will be noted that there were two visits and two dressings nearly every day for the first sixty days.  That most of such service could have been efficiently performed by any fairly intelligent attendant under the directions of the physician, he being easily within reach in case of there being any special reason for his presence, needs no evidence other than our own common sense and common experience in life.  It must be remembered that trial tribunals are not, necessarily, bound by the testimony of experts merely because of their special knowledge.  One who by reason of such knowledge is competent to give opinion evidence may deal in such exaggerations, especially when they favor his selfish interests, as in this case, as to render his evidence of little or no value, even when unopposed by evidence from the mouth of any other witness.  *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 331, 80 N. W. 644; *Bucher v. Wis. Cent. R. Co.* 139 Wis. 597, 120 N. W. 518.  It has been often said that opinion evidence is not conclusive in any case; that if it is not within the scope of reason and common sense it should not be regarded at all.  Triers circumstanced like the *Industrial Commission,* have a right and duty to apply their own common sense and experience to such a situation as existed here and not to allow a claim which appears manifestly exorbitant merely because verified by the person to be benefited by its allowance.  No more should have been allowed in this case than would appear to a reasonable certainty fair in case of the injured man being responsible for payment without any right to reimbursement.

What has been said would require a large reduction of the allowance for services of the physician if the solution of

questions yet to be considered should leave any room for allowing the claim at all.    Notwithstanding such solution must eliminate the Bradstad claim entirely from the case, as will be seen, it has seemed that we ought not to decide the matter without passing upon the merits of the decision below, and not let the opportunity pass for speaking of the requirements of the law as to the manner of dealing with such claims,—affording guidance for administrative efforts.    That the *Commission* has labored hard to respond to the duties imposed by law and has, in general, won distinction for rapidly and satisfactorily disposing of a multitude of cases, and demonstrating the wisdom of the new system, may be fairly conceded without militating against the thought that judicial suggestions in the interests of administrative efficiency will be welcomed.

The next question presented involves a very important feature of the Workmen's Compensation Law.    Failure to preserve the integrity of such feature and to give effect thereto in letter and spirit would go far toward bringing discredit upon the new system by appearance that some of the significant infirmities and abuses incident to the old system are incident as well to the new.

Formerly there was a somewhat popular notion, and by no means not without good ground therefor, that misfortunes of injured employees were often exaggerated and made unnecessarily burdensome to their employers by such employees, their lawyers and doctors combining to that end, and generally to the great detriment of employees and employers, and the public as well.    It may well be that such instances were exceptional rather than common, though there was enough of basis for such popular idea to regrettably cast discredit upon the learned professions.    To rescue such professions from such discredit and remove opportunity for selfishly exploiting the misfortunes of employees at the expense of their employers and the public, careful provision was made to protect

claimants from court costs and attorney's charges and employ-
ers from false claims and fraudulent or needless prolonga-
tion of disability, while recognizing that the expenses incident
to surgical and medical attention to an injured person are a
necessary part of his reparable loss.. To that end it was pro-
vided by sub. 1, sec. 2394—9 of the Compensation Act, that:

"Where liability for compensation under this act exists
the same shall be as provided in the following schedule:

"(1) Such medical and surgical treatment, medicines,
medical and surgical supplies, crutches, and apparatus, as
may be reasonably required at the time of the injury and
thereafter during the disability, but not exceeding ninety
days, to cure and relieve from the effects of the injury, the
same to be provided by the employer; and in case of his neg-
lect or refusal seasonably to do so, the employer to be liable
for the reasonable expense incurred by or on behalf of the
employee in providing the same."

The purpose of that provision is manifest; but if it were
otherwise the report of the legislative committee which
drafted the law would remove all possible doubt. In that,
as indicated by appellant's counsel, we find the following:

"The employer must provide medical and surgical treat-
ment, medicine, etc., for ninety days. This provision is
made for two reasons: First. As a rule an employer is more
competent to judge the efficiency of the doctor employed and
to provide efficient medical and surgical treatment. Second.
It is to the interest of the employer to furnish the very best
medical and surgical treatment, so as to minimize the result
of the injury and to secure as early a recovery as possible.
The more serious the result of the injury, the more the em-
ployer must pay. Also by this means he obtains a complete
knowledge of the exact condition of the injured employee."

Thus, the burden for all reasonable medical aid and sur-
gical treatment, medicine, etc., is cast on the employer, lim-
ited as to time, with the very wise and necessary safeguard
against imposition that the choice of the medical or surgical
attendant shall be left with him and that, if the injured per-

son unnecessarily chooses his own physician, he will do so at the peril of having to bear the burden of the expense. That is a very valuable protection to injured persons as well as to employers. The natural effect of a firm enforcement of it will be to expedite the return of honest claimants to the walks of industry and prevent them from having their misfortunes exploited for others' benefit. If the advantages to be gained by a firm administration of such provision would be greater on one side than on the other, it is the side of the employees. Therefore, in case of a personal injury to an employee in the line of his duty, the law should be construed and applied so as to secure to his employer reasonable opportunity to conserve the mutual interests of the two parties to the misfortune by supplying the medical and surgical needs of the injured.

The logic of the foregoing is plainly this: It is the duty of an injured employee who needs, or supposes himself to need, medical and surgical treatment to give his employer reasonable notice thereof. The privilege of the latter, necessarily, implies the right to reasonable opportunity to exercise it. Such opportunity should ordinarily be accorded by the act of the injured man, not secured by the employer keeping in his service a physician and surgeon charged with the duty of discovery. Note, that the employer is not made liable for the reasonable expenses incurred by or on behalf of the employee in providing medical aid and surgical treatment, except in case of "neglect or refusal seasonably to do so." This language, as indicated, by necessary inference, implies that he shall have reasonable notice of the employee's need of treatment and desire and willingness for him to act in the matter. The idea indulged in below that the provision casts a duty on the employer of active vigilance to discover the necessities of injured employees, such as by keeping a physician and surgeon constantly employed and on the alert to make discoveries, we do not find in the law in letter or

spirit.   On the contrary, we find such idea plainly negatived by the language and purpose of the enactment.   The legislature, certainly, never dreamed of casting any such burden on employers as that suggested by the *Commission* in its decision.   To give the law the contrary cast by administration would defeat one of its most valuable safeguards and open up a very inviting field for the medical profession to win discredit,—one which doubtless its members having high ideals would gladly have closed and which justice to employer, employee, and the public demands shall be closed.

The result is that *Miller,* since he failed to notify his employer of his need, never had competency to employ a physician at the expense of the city of *Milwaukee,* except for such reasonable length of time as necessarily intervened between his injury and reasonable opportunity after due notice for the city to exercise its privilege.   The time could not have been long.   How long, it is impossible to determine from the record.   It is quite certain that *Miller* voluntarily selected Dr. Bradstad to treat him,—not knowing, probably, of the municipality's privilege in the matter.   That is his misfortune and, however much it may be regretted, it is far better that the integrity of the law be not invaded than that it be impaired in the slightest degree in the particular instance to avoid the consequence of his not knowing or appreciating its requirements.

The services of the nurse for which $32 were allowed were rendered during the first four weeks after the injury.   It is noticeable that, notwithstanding Dr. Bradstad visited his patient twice each day for some forty days thereafter, the recovery had so far progressed that services of a nurse were considered unnecessary.   The scheme of the legislature included definite specifications of just what burdens an employer shall bear for the benefit of his injured employee.   No mention is made in such specifications of services of a nurse during the first ninety days.   Therefore, compensation of

that sort must be regarded as not within legislative contemplation, except as included in the term "medical and surgical treatment . . . reasonably required." It has become so common for a physician or surgeon to have a nurse as his assistant, in cases requiring attention at shorter intervals than he can well be present, that the major service may well be regarded as including the minor attention, in all cases where a nurse is employed by the physician or surgeon, or by his direction, and the services are an incident of the treatment; and that would obtain whether the medical or surgical attendant is engaged by the employer or employee. In neither case is there any warrant in the law, as it seems, for allowing compensation for services of a nurse, other than incidental to medical or surgical attention, during the ninety days immediately succeeding the injury.

We do not fail to note counsel's claim that services of a nurse are inferentially provided for in sub. 1 of sec. 2394—9, as evidenced by the allowance for like services by this language of sub. (a) of sub. 2 of such section:

"Provided that, if the disability is such as not only to render the injured employee entirely incapable of work, but also so helpless as to require the assistance of a nurse, the weekly indemnity during the period of such assistance after the first ninety days shall be increased to one hundred per cent. of the average weekly earnings."

That plainly indicates that the legislature did not intend to make nurse's services compensable as such, except contingently and by the allowance of one hundred per cent. of the average weekly wages instead of sixty-five per cent. Manifestly, double expense for nurse's services could not have been contemplated. Therefore, in case of the full allowance of one hundred per cent. of the weekly wages under sub. (a) no further compensation for nurse's services could be allowed as included in medical and surgical treatment, except during the eight-day interim between the date of the

injury and commencement of the compensable disability period; but, in any case, good administration would require, it seems, that the necessity for services of a nurse should be certified to by the attending physician or surgeon, as a pre-requisite to its allowance either as an incident to the medical or surgical treatment or greater allowance for disability indemnity.

What has been said, sufficiently for the case, disposes of the claim for services of a nurse; but another reason is advanced why the allowance should not have been made here under the circumstance that the service was voluntarily performed by a relative of *Miller,* who resided in the house with him, without promise or expectation of compensation. The fact that she was a minor makes no difference. Whatever she did was done substantially in the presence of her mother and, evidently, with the latter's sanction. As the mother was a nearer relative of *Miller* than the niece who performed the service, if the question of whether the attention is compensable as a legal liability be referable to the attitude of the former, the inference is all the stronger that the same was intended to be gratuitous.

The *Commission* probably applied the rule in negligence cases that he who is liable for damages for a tortious injury cannot mitigate the amount of the recovery by taking advantage of the gratuitous services of loving care of family or friends. *Hulehan v. G. B., W. & St. P. R. Co.* 68 Wis. 520, 32 N. W. 529; *Crouse v. C. & N. W. R. Co.* 102 Wis. 196, 205, 78 N. W. 446, 778; *Johnson v. St. Paul & W. C. Co.* 131 Wis. 627, 111 N. W. 722.

The line of cases referred to and the rule deducible therefrom is very familiar; but it is by no means clear that they apply to the circumstances before us. The rule is grounded, not on a statutory liability, but the common-law principle that he who tortiously injures another in his person or his property incurs a legal liability to make good to that other all

the loss which is directly and naturally caused thereby, regardless of any element of reasonable anticipation of consequences. This extreme and rather harsh rule is characterized by a penal element, grounded on the moral turpitude of the wrongful act. Under the statutory system for dealing with personal injury losses incident to performance of the duties of an employer, they are regarded as mutual misfortunes to be charged up, as directly as practicable, to the cost of production. The right to have the employer regarded as an agency to make payment to the employee and absorb the same as an expense of the industry, regardless of whether the loss is attributable to any human fault, is a legislative creation within the constitutional exercise of the police power to legislate for the public welfare. It is not a charity but the recognition of a moral duty and the erection of it into a legal obligation of the public, not of the mere employer, to compensate, reasonably, those who are injured while in the employment of others, as a part of the natural, necessary cost of production; that obligation being discharged through the agency of the employer.

Thus the reason of the old rule applicable to wrongs does not furnish any sound basis for allowing compensation for the services of a nurse under the circumstances of this case. The beneficence of the law in recognizing moral duty, goes no further than its specifications, read in the spirit of the enactment. That does not go to the extent of mulcting, indirectly, consumers to compensate for services gratuitously performed in taking care of injured persons. It is confined to the reasonable expense incurred by or on behalf of the employer in providing the specific elements of relief mentioned in sub. 1, sec. 2394—9 of the statute; giving to the words "reasonable expense incurred" their fair meaning, in the light of the system the legislature created. "Reasonable expense incurred," should be viewed from the standpoint of the injured person, where reasonably necessary, being, by law,

the agent of the employer to act in their mutual interests in incurring the expense,—the possessor, so to speak, of a power in trust and in duty bound to act fairly for both parties. The more clearly it is appreciated that the basic logic of the law is mutuality of interest between employers, employees, and the public, and that each actor is charged with the duty of promoting the mutual interests, the more apparent the high ideal the legislature had in mind in creating the new system, and the greater the prospect of such ideal being realized. Nothing short of reasonable expenditure of money, or incurring of legal liability to expend money for the purposes contemplated in the act, can be held to satisfy the legislative conception of "reasonable expense incurred" as the words were used in the act. The services of a nurse in this case obviously do not fall within such meaning.

The result of the foregoing is that the judgment appealed from must be modified by deducting the charges for nurse and for medical and surgical treatment, leaving the sum of $177.50, and as so modified, be affirmed.

*By the Court.*—So ordered.

SIEBECKER and TIMLIN, JJ., took no part.