GENERAL ACCIDENT, FIRE & LIFE ASSUR. CORP., Limited, v. EVANS et al. (No. 7896.)

(Court of Civil Appeals of Texas. Dallas. Feb. 16, 1918. Rehearing Denied March 16, 1918.)

1. MASTER AND SERVANT ☞372—WORKMEN'S COMPENSATION—MASTER'S NEGLIGENCE.

Under the Workmen's Compensation Act (Acts 33d Leg. c. 179, Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz), compensation may be awarded, although the employer's negligence did not proximately cause the injury.

2. MASTER AND SERVANT ☞373—WORKMEN'S COMPENSATION — RESCUE OF FELLOW SERVANT.

Where an employé loses his life in rescuing a fellow employé while both are working in the course of their employment, relatives may recover workmen's compensation, at least where the deceased was not positively prohibited by his employer from undertaking the rescue.

3. MASTER AND SERVANT ☞405(1) — WORKMEN'S COMPENSATION—SUFFICIENCY OF EVIDENCE.

Evidence regarding warnings and protests by an employer's superintendent against an employé descending into a vat to rescue a fellow employé *held* to sustain the trial court's findings that they did not constitute positive commands not to undertake the rescue.

4. MASTER AND SERVANT ☞417(4½)—WORKMEN'S COMPENSATION — CONCLUSIVENESS OF AWARD.

Under Workmen's Compensation Act, art. 5246q, providing that a party unwilling to abide by the Industrial Board's findings may appeal, and in such case the board shall proceed no further, a party not exercising his option to transfer the case to court before the board's final decision is bound thereby.

5. MASTER AND SERVANT ☞385(1) — WORKMEN'S COMPENSATION—JUDGMENT.

A workmen's compensation judgment for a certain sum and over 200 future weekly installment items, for which execution should issue, if not paid when due, was not improper.

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Proceeding under the Workmen's Compensation Act by James Evans and others against the General Accident, Fire & Life Assurance Corporation, Limited. An award was confirmed by the district court, and the company appeals. Affirmed.

Smith, Robertson & Robertson, of Dallas, for appellant. J. W. Ownby, of Paris, and Curtis Hancock and George & Hardwicke, all of Dallas, for appellees.

TALBOT, J. The surviving widow and minor children of Russell Engledove, deceased, the widow suing in her own right and the children by their next friend, James Evans, appellees, brought this suit against the General Accident, Fire & Life Assurance Corporation, Limited, of Perth, Scotland, appellant, to recover the compensation due them under what is known as the Workmen's Compensation Act of this state, on account of the death of the said Russell Engledove while in the employ of O. L. Gregory Vinegar Company at Paris, Tex. The sufficiency of the pleadings is not questioned, and the salient facts agreed to and developed in the trial, in substance, are as follows:

Russell Engledove, a negro, on October 29, 1914, was in the employ of the O. L. Gregory Vinegar Company, a corporation engaged in the manufacture of vinegar, and on that date lost his life in an attempt to rescue from death a fellow employé. The O. L. Gregory Vinegar Company had in all respects complied with chapter 179 of the Acts of the Thirty-Third Legislature of the State of Texas, relating to employers' liability and providing for the compensation of certain employés, and had elected to carry employers' liability insurance with the appellant, the General Accident, Fire & Life Assurance Corporation, Limited. Prior to the 29th day of October, 1914, the said appellant had issued to the O. L. Gregory Vinegar Company a valid policy of insurance for the benefit of the employés of said company, and for the benefit of the heirs and beneficiaries of such employés. The appellee Alice Engledove was the wife of Russell Engledove at the date of his death, and the other appellees, Mal-

colm and Wesley Engledove, were his only children. The deceased, Engledove, was a general laborer, and was shifted, as were all the other employés, as occasion demanded from one department to another. For some time prior to his death Engledove was employed in the cooperage department. He had, however, during his employment, cleaned out vinegar tanks; but that was no part of his duty on October 29, 1914, the date of his death. On the 29th day of October, 1914, Frank M. Crawford was superintendent of the vinegar company, and Herman Ingram was said company's foreman, and both had authority to employ and discharge Russell Engledove.

In the manufacture of vinegar, large vats or tanks were used by the vinegar company, in which to place sugar for fermentation. In the fermentation of the sugar in the vat, a deadly, poisonous gas is generated, and after the contents of the vat are withdrawn the vat remains charged or filled with such gas. The vats of the vinegar company were about 15 feet in height, and entrance into them was through an opening in the top. It was necessary from time to time for some employé of the vinegar company to enter these vats and clean them out. For the purpose of driving the deadly gas out of the vat, and to prevent a person from being overcome by its effects, water was used. On October 29, 1914, about 12:30 o'clock p. m., in the usual course of the work in connection with the manufacture of vinegar, it became necessary and proper to clean one of the vinegar vats. Herman Ingram, the foreman, took two negroes, one of whom was named Thomas Nelson, and went on top of the vat for the purpose of cleaning it out. After reaching the top of the vat, Ingram left the two negroes there and went to the pump room to turn on the electric light to use in cleaning out the vat. At the time he left he cautioned the negroes not to go into the vat. He was gone about five minutes. When he returned he found the negro Thomas Nelson at the bottom of the vat lying on his back overcome by gas. The foreman at once called for help, and thereupon great excitement prevailed in the factory. The negro women, there being a number employed, began to scream and holloa, and the employés generally began to gather about the top of the vat in response to the foreman's cry for help. Among those who came was the superintendent Frank Crawford. When the superintendent reached the top of the vat, he began trying to fasten a hook, attached to a rope and dropped into the vat, into the belt worn by Nelson, with a view of drawing him out of the vat. At the same time one of the employés lowered an electric light into the vat, while another threw water from a hose in Nelson's face, for the purpose of trying to keep him from being killed by the gas. The superintendent was unable to hook the belt of Nelson, and was unable to accomplish his rescue by that method. At the time the negro Nelson was overcome in the vat by the gas, and at the time Foreman Ingram called for help, Russell Engledove, the deceased, was eating his dinner in the boiler room of the factory, and in response to the cry of the foreman for help he rushed to the top of the vat in which Nelson was lying. When he reached the top of the vat he seemed to realize that the superintendent, Crawford, was doing no good in fishing for Nelson's belt with the rope and hook, and that unless something was done at once Nelson would be dead before he could be taken out. Immediately thereupon Engledove wrapped a "gunny sack" around his head and face and descended into the vat by means of a ladder, attached the hook and rope to Nelson's belt, and Nelson was pulled out of the vat and after a time recovered from the effects of the gas. When, however, the deceased, Engledove, attempted to mount the ladder and ascend from the vat, he was overcome by the poisonous gas and died.

A "gunny sack" saturated with water wrapped around the head will in a measure protect a person from the effects of the poisonous gas found in the vat in which Engledove was overcome and died. At the time the deceased, Engledove, entered the vat, he did so for the purpose of rescuing and saving the life of his fellow employé, Thomas Nelson. He was laboring under great excitement and acting in an emergency. He was warned of the danger and told not to go into the vat. In this connection the foreman Ingram testified:

"Russell [Engledove] tied a piece of gunny sack about his face and started down into the tank under protest from me and others. We tried to keep him from going."

He further stated:

"When I saw Engledove start to go down into the tank, as I have stated already, I protested, fearing that he would be overcome by the gas; but seeing the peril of Nelson, and I suppose realizing that unless something was done at once Nelson would be dead before he could be gotten out, and that Crawford, who was fishing for Nelson's belt with a rope and hook was not doing any good, Engledove tied the gunny sack around his head and started down into the tank, and as he went by Crawford turned the hose on him and wet the sack."

Again he said:

"Then Engledove came. He came on the run right across the top of the tanks. He stopped just long enough to put a piece of burlap across his face. I think that some one on the top of the tank handed him the burlap. He said: 'Let me there. I will go and get him.' Mack Jones said: 'Stay out of there; do not go in there.' That is all that I remember that was said. There were a great many people there then, and a lot of excitement."

The superintendent testified that he got a rope with a hook on the end of it and began to fish for Nelson's belt and clothing, so as to pull him out, but could not get any hold; that about this time Russell Engledove, the deceased, came running to the vat; that the

first thing Engledove did was to tie a piece of gunny sack about his face and start down the ladder into the tank under protest from several of those present. In another place in his testimony he said:

"Russell Engledove came running to the tank, tied a piece of gunny sack around his face, and started down the ladder into the tank, although the rest of us, as I have stated, told him of the danger. As he went by me, I turned the water on his head, so as to wet the sack and keep down the danger from the gas. When Engledove came to the tank, I was fishing for the negro Nelson, with a hook on the end of the rope, trying to catch his belt, but was not having any success, and we all realized, of course, that unless something was done at once Nelson would die."

He further said:

"I knew, from the gas and the effect it had on Nelson, that it was extremely dangerous. I told Engledove that it was dangerous, and not to go into the tank. I do not remember my exact language, but that was the sum and substance of what I said. Engledove came up in a hurry, picked up a piece of burlap, and put it around his face, and went by me down the ladder, and I turned the water hose on him."

Van Richardson, one of the laborers for the vinegar company, said that before Engledove went down into the vat several of the men standing around told him not to go. Who these men were he did not know. He said that Engledove remarked, "Shorty, I believe, if I put something over my nose, I can rush down right quick and tie the rope around him and come out right quick;" that some one said, "No, Russell, don't go into that tank." Mack Jones, another laborer said:

"I told him [Engledove] not to go; that one man in there was enough, and if he went it was apt to kill him. I caught hold of him, and again tried to keep him from going, but he went. As he started into the tank, I caught him by his jumper, and said, 'Oh, Russell, please don't go in there.' I think that was what I said."

After the death of Russell Engledove, a claim for damages on account of his death was submitted to the Industrial Accident Board of Texas in keeping with the terms and conditions of the act of the Legislature of the state of Texas relating to employers' liability and providing for the compensation of certain employés and their representatives and beneficiaries for personal injuries sustained in the course of employment, and all the conditions and terms of said act were complied with, and thereafter, on the 29th day of December, 1914, said Industrial Accident Board entered its judgment allowing the appellees, as the heirs and beneficiaries of the said Russell Engledove, compensation in the sum of $6 per week during a period of 360 weeks, to run from the date of the death of said Russell Engledove. This decision was not recognized and complied with by appellant, and this suit followed. The trial was before the court without a jury, and judgment rendered in favor of the appellees for sums aggregating $2,160, from which appellants perfected an appeal.

The question presented by the appellant's assignments of error is whether or not, at the time Russell Engledove met his death, he was acting within the course of his employment, within the meaning of what is known as the Workmen's Compensation Act of the state of Texas. The contention is that the uncontroverted evidence shows that:

"Russell Engledove, in entering the vinegar vat, did so contrary to the orders and commands of his superiors duly authorized to give such commands and to require obedience thereto, and he thereby pro hac vice severed his employment with the master, and for the purpose of said venture put himself without the course of his employment under his master, and became a mere volunteer, without the benefits of said Workmen's Compensation Act of the state of Texas."

Another question arises on the appeal, and that is whether or not the decision of the Industrial Accident Board upon the claim of appellees, as disclosed by the record, is conclusive and final of the matter? Of course, if this question should be answered in the affirmative, the Industrial Accident Board settled the controversy. We shall, however, discuss first the question presented in appellant's brief; that is, does the uncontroverted evidence show that Russell Engledove entered the vat and sacrificed his life to save the life of his fellow employé under circumstances which necessarily show that for the purpose of such venture he put himself without the course of his employment and became a mere volunteer?

[1, 2] It has been held, in effect, that, in construing a statute of the character of the one under consideration the conditions giving rise to the law, the faults to be remedied, the aspirations evidently intended to be embodied in the enactment, and the effects and consequences as regards responding to the prevailing conception of the necessities of public welfare, should be considered, and the enactment given such broad and liberal meaning as can be fairly read therefrom, so far as required to effectively eradicate the mischiefs it was intended to obviate; that a proper administration of the Workmen's Compensation Act requires appreciation of the manifest legislative purpose to abolish the common-law system regarding injuries to employés as unsuitable to modern conditions and conceptions of moral obligations, and to erect in place thereof one recognizing every personal loss to an employé, not self-inflicted, as necessarily entering into the cost of production, and required to be liquidated in the steps ending with compensation. City of Milwaukee v. Miller, 154 Wis. 652, 144 N. W. 188, L. R. A. 1916A, 1, Ann. Cas. 1915B, 847. The foregoing views aptly express, we think, those things that should serve as a guide in the interpretation of a statute like the one to which they relate. The Workmen's Compensation Act of Wisconsin (Laws 1911, c. 50), the state in which the case cited was decided, includes within its protection all in-

juries received by an employé in the course of his employment proximately caused by accident, except such as may have been intentionally inflicted. Our statute upon the subject authorizes a recovery of damages for personal injuries sustained by an employé of a subscriber in the course of his employment, or for death resulting from personal injury so sustained, but provides that the employer may defend in an action brought to recover such damages on the ground that the injury was caused by the "willful intention of the employé to bring about the injury." That the employer was negligent, and that such negligence was the proximate cause of the injury, are not essential facts to a recovery under this statute. The right to recover under it may be predicated, it seems, alone upon the fact that the injury was sustained by the employé "in the course of his employment," subject, however, to the defense, as indicated, that the injury was caused by the willful intention of the employé to bring about the injury.

The able counsel for appellant in their argument admit the well-recognized general rule that, where a servant's life is placed in jeopardy through the negligence of his master, a third person, who undertakes to rescue such person from his dangerous situation, is not a mere volunteer, and may recover if he be injured in the undertaking. It is also admitted that there are decisions in some jurisdictions which hold, in construing Workmen's Compensation Acts, that it is the duty of every employé to undertake to prevent injury to and the death of fellow employés, and that in such attempts they are acting within the course of their employment. The question has not been passed upon by any appellate court of this state, so far as we are aware, and in cases in which the question arose in other states the decisions of the courts are at some variance. In some of them it was held that a workman, who goes to the rescue of his master or of another workman, and is thereby injured, is not entitled to compensation. But courts of recognized ability have, on the contrary, held that it is the duty of a workman, when the necessity arises, to do what he can to save the life of his fellow employés, when they are at the time working in the line or course of their employment. Dragovich v. Iroquois Iron Co., 269 Ill. 478, 109 N. E. 999; Waters v. William J. Taylor Co., 218 N. Y. 248, 112 N. E. 727, L. R. A. 1917A, 347; Rees v. Thomas, 1 W. C. C. 9; Matthews v. Bedworth, 1 W. C. C. 124; London & Edinburgh Shipping Co. v. Brown, 42 Scottish L. R. 357; Labatt on Master & Servant, vol. 5, § 1806. The rule announced in the cited cases is humane, just, and reasonable, and we prefer to follow it. In the case of Dragovich v. Iroquois Iron Co., supra, the Supreme Court of Illinois held that injuries received by one employé of the company while endeavoring to rescue another employé from serious danger arose out of his employment, and expressed the view that any other rule of law than the one announced in that case would be not only inhuman, but unreasonable and uneconomical, and would, in the end, result in financial loss to employers on account of injuries to their employés. In these views we concur. The employer has a pecuniary interest in the lives of his employés. He necessarily relies upon their labor for the conduct of his business, out of which he expects to reap a profit, and the attempt of Russell Engledove to rescue Thomas Nelson, the servant of the vinegar company, and his fellow employé, must be regarded as having been made in the interest and for the benefit of such common employer.

[3] But appellant, as we understand, without admitting or denying the correctness of the principle enunciated in the authorities to which we have referred, contends that it cannot be applied in the instant case, because the evidence conclusively shows that the superintendent and foreman of the vinegar company were present when Russell Engledove started to enter the vat in question for the purpose of rescuing Thomas Nelson, and commanded him not to do so; that, having thus been commanded not to enter the vat, his disobedience of it placed him without the course of his employment, and his wife and children cannot recover compensation for his death. As disclosed by the evidence and facts detailed in the former part of this opinion, appellant's superintendent and foreman, as well as several common laborers, who were present when Engledove entered the vat, testified without dispute that they severally protested against his going into the vat, and told him not to go; but whether this was in fact intended as a positive command on the part of appellant's representatives, and so understood by Engledove, or a mere suggestion that it was dangerous to do so, and simple protest against incurring such danger, was, we think, a question for the consideration and determination of the trial court. The able district judge who tried the case, in the conclusions of fact and law filed by him, declares that he was unable to find from the testimony in the case, considering all of it, that either appellant's "superintendent or foreman, in keeping with his authority and as a command, commanded Russell Engledove, the deceased, not to enter the vat." He further declared, in effect, that if what was said by appellant's superintendent, or its foreman, to Engledove, in relation to his going into the vat, could be held to be a command not to go into it, such command and its disobedience did not put the said Engledove without the scope and course of his employment.

We regard the declaration of the district judge that he was unable to find from the testimony that either the appellant's superintendent or foreman commanded Engledove not to enter the vat as the expression of

his opinion that such was not intended to be and was not, as a matter of fact, the effect of the language used. In this view of the trial court we are disposed to concur. At least we are not prepared to say that such conclusion is wholly unwarranted by the testimony. It is clear and undisputed that, whatever was said to Russell Engledove in the nature of warnings, protest, or command not to enter the vat, the same occurred immediately after appellant's foreman had cried out for help to save the life of a human being, the colaborer of himself, Russell Engledove, and other employés of the vinegar company, and during great excitement and confusion on the part of all present. The foreman's cry for help and the actual situation suggested and called for heroic action, and that there was great eagerness manifested for some person to attempt the rescue of Thomas Nelson from his perilous position—yea, a demand for some person to make such attempt, although it would be fraught with great danger—can easily be imagined. This person was found in Russell Engledove. He believed, as shown by his statement, that by wrapping a wet gunny sack around his face and head he might, without loss of his own life, save the life of his colaborer, Nelson. So, with the gunny sack wrapped about his face and with the appellant's superintendent throwing water upon him with a hose, Engledove, in an emergency and at the risk of his own life, unselfishly, bravely, and heroically descended into the vat and saved the life of Nelson, but at the sacrifice of his own. The conclusion, when all the facts and circumstances in the case are considered, that appellant's superintendent and foreman intended, by the remarks made to the deceased at the time he was preparing to enter the vat, to simply warn him of the danger of doing so, and a mere protest against it, and not in the sense of a command not to do so, or as forbidding the act is not unreasonable and unwarranted, and we are unwilling to disturb the judgment of the trial court for the reasons urged by appellant under the assignment under consideration.

The foregoing views render it unnecessary for us to determine whether or not a positive command from appellant's superintendent or foreman to Russell Engledove not to enter the vat would have put him, in violating such a command, without the course of his employment. We may say, however, in passing, that much authority may be found to the effect that, if the act of the employé resulting in injury to him is within the scope of his employment, although he was expressly forbidden to do it, it would not necessarily defeat his claim for damages. In Whitehead v. Reader, 2 K. B. 48, as quoted in Bradbury's Workmen's Compensation, it is said that it is not every breach of a master's orders that would have the effect of terminating the servant's employment, so as to excuse the master from the consequences of the breach of his orders; that we have to get back to the orders emanating from the master, to see what is the sphere of employment of the workman, and it must be competent to the master to limit that sphere. If the servant, acting within the sphere of his employment, violates the order of his master, the latter is responsible. This indicates, as we believe, the general rule upon the subject.

[4] This brings us to the other question arising on the appeal, namely, whether or not the decision of the Industrial Accident Board upon the claim of appellees, as shown by the record, is conclusive and final of the matter. According to decisions of the Court of Civil Appeals of the Sixth District, construing the article of the statute (5246q) upon which a decision of this question turns, it should be answered in the affirmative. The article mentioned, which forms a part of the Workmen's Compensation Act of this state, provides:

"All questions arising under this act, if not settled by agreement of the parties interested therein, shall, except as otherwise herein provided, be determined by the Industrial Accident Board. Any interested party who is not willing, and does not consent to abide by the final ruling and decision of said board on any disputed claim may sue on such claim or may require suit to be brought thereon in some court of competent jurisdiction, and the board shall proceed no further toward the adjustment of such claim: Provided, however, that whenever any such suit is brought, the rights and liabilities of the parties thereto shall be determined by the provisions of this act, and the suit of the injured employé, or persons suing on account of the death of such employé, shall be against the association, if the employer of such injured or deceased employé is at the time of such injury or death a subscriber, as defined in this act, in which case the recovery shall not exceed the maximum compensation allowed under the provisions of this act, and the court shall determine the issues in such cause instead of said board."

In the cases cited the Court of Civil Appeals at Texarkana construed the foregoing article of the statute as providing by its terms that the parties at interest in the claim made under the Workmen's Compensation Act have the option to go or appeal to the courts for determination of the claim under the act, or may consent and proceed under the act, and have the Industrial Accident Board make a final decision upon and adjust the claim; that when the parties at interest in the claim made under the act consent for the Industrial Accident Board to take proceedings and finally determine the claim for compensation, and do not withdraw consent before there has been a final ruling and decision by the board upon such claim, then, in virtue of the exercise by the parties of their option, the decision of the Industrial Accident Board upon the claim is, by the very terms of the act, final. The court points out that the compensation to be awarded is fixed by the terms of the act, and that the language of the article quoted, that "the

board shall proceed no further toward the adjustment of such claim" when any interested party in the claim "is not willing, and does not consent to abide by the final ruling and decision of said board on any disputed claim," indicates the intention to require any interested party in the claim to exercise his option to resort or appeal to the courts before the board makes final decision upon and adjustment of the claim made under the act. We concur in the foregoing construction of, and comment upon, the statute. It satisfactorily expresses our views, and leaves nothing useful or of benefit for us to say upon the subject.

As to the submission of the claim of appellees to the Industrial Accident Board, and the board's action in regard thereto, it was agreed, and the trial court found, as follows:

"After the death of Russell Engledove, appellees' claim for damages growing out of his death was submitted to the Industrial Accident Board of Texas, in keeping with the terms and conditions of the said act of the Legislature of the state of Texas, and all the conditions and terms of said act were complied with; and thereafterwards, on the 29th day of December, 1914, said Industrial Accident Board entered its judgment allowing the heirs and representatives of said Russell Engledove compensation in the sum of $6 per week during a period of 360 weeks, to run from the date of the death of said Russell Engledove."

There is no positive testimony in the record showing that appellant expressed its consent to abide by the final ruling and decision of the Industrial Accident Board, or that it entered its appearance before said board; but we do not regard it essential to the binding force and effect of the decision of said board, or necessary to authorize the conclusion in this court that such decision was conclusive and final of appellees' right to compensation for the death of Russell Engledove, that such consent was given or appearance entered. Article 5246ppp of the Workmen's Compensation Act provides that no proceeding for compensation for injury under the act shall be maintained unless notice of the injury shall have been given to the association or subscriber, as soon as practicable after the happening thereof, and unless the claim for compensation with respect to such injury shall have been made within six months after the occurrence of the same, etc.; and it was admitted by appellant, and found by the trial court as above shown, that appellees presented their claim for compensation to the Industrial Accident Board in keeping with the terms and conditions of the Workmen's Compensation Act and that all the conditions and terms of said act were complied with. There is no pretense that appellant did not receive the notice required by this statute, or that it was not fully aware of the proceedings instituted before the Industrial Accident Board by appellees upon their claim. Nor is there anything in the record to indicate that

appellant expressed any unwillingness to abide by the final decision of the Industrial Accident Board before such decision was rendered. Having acquiesced in the proceedings before the Industrial Accident Board, and failed to express any unwillingness to abide by its final decision, appellant will not now be allowed to escape the consequences of that decision on the ground that it fails to appear affirmatively or by direct testimony that it consented to abide by the final ruling and decision of the Industrial Accident Board, or be heard to say it did not consent to abide by such decision. If, in fact, it was unwilling, and did not consent to abide by the final decision of the Industrial Accident Board, such unwillingness and lack of consent should have been made known to that board before its decision was made. It will not be permitted to remain quiescent, and speculate on the probable decision of the board, and, if unfavorable, be heard to say it is not binding upon it, because it never expressed its consent to abide by the board's decision.

[5] What we have said practically disposes of all of the assignments of error, except the fourteenth. This assignment is to the effect that the judgment of the trial court is contrary to law, in that it attempts to create an installment liability against the appellant and "awards damages prospectively, and awards executions prospectively; it appearing that under the purported judgment herein entered that plaintiffs may become entitled to over two hundred separate and different executions for installments of compensation not yet due." It is believed there is no material error in the judgment. The compensation awarded and the provision made for its payment are in accordance with the statute. Weekly installments amounting to $789.80 were found to be due at the date of the rendition of the judgment and execution authorized therefor. Further sums of $6 each were allowed and made payable weekly, with direction that, if such payments were not paid, then due execution therefor should issue. That the award of such weekly sums is clearly authorized by the statute can hardly be questioned, and that appellees would be entitled to an execution to enforce their payment when due, if not voluntarily paid by appellant, seems but reasonable and just. The issuance of the numerous executions which appellant says appellees will be entitled to under the judgment as framed will be entirely avoided by payment of the several installments awarded when due.

Under either phase of the case discussed, in this opinion, we think the law is with appellees, and that the judgment of the district court should be affirmed. It is therefore accordingly so ordered.

Affirmed.