Nickels, Administratrix, Respondent, vs. Manitowoc Ship-building & Dry Dock Company, Appellant.

*April 8—April 29, 1913.*

*Master and servant: Injury from unguarded shafting: Evidence: Custom in other shops: Ordinary method of doing work: Expected method: Broken pulley: Cross-examination of adverse witness: Special verdict: Appeal: Harmless errors.*

1. Where employees are expected and required at times to ascend upon a staging and work in close proximity to a line shaft while in motion, such shaft, though elevated nearly fourteen feet above the floor, is within the provisions of sec. 1636j, Stats., requiring the guarding of all shafting so located as to be dangerous to employees in the discharge of their duties.

2. In an action for the death of an employee who was caught on such a line shaft, evidence that line shafting of the same general nature in other shops was not usually guarded, was neither controlling nor of much weight, where it appeared that in such shops employees were not expected, in the course of their duties, to approach the shafting while in motion.

3. Error in refusing to permit cross-examination of an employee of defendant, called as an adverse witness under sec. 4068, Stats., cannot be regarded as prejudicial where such witness was called almost at the close of plaintiff's case and defendant could have put him upon the stand as a witness for the defense within a few minutes after his examination as an adverse witness ceased, but did not choose to do so.

4. In an action for the death of an employee, caused by being caught on a line shaft while engaged, according to plaintiff's theory, in putting a belt onto a pulley on such shaft, there being no wit-

ness who saw the accident, it was competent to prove by other shop employees the ordinary method of putting a belt on under the circumstances, that not being a matter of common knowledge, in order to show that the deceased would thereby be brought in close proximity to the shaft where his clothing would be likely to be caught.

5. After defendant's foreman had testified that the belt which the deceased was putting on at the time of his death was always put on while the shaft was in motion, there was no error in permitting him to testify that he expected the deceased would do it in that way when he sent him to the place.

6. Where a break on the edge of a pulley was alleged in the complaint to be one of the causes of the death of plaintiff's intestate, but no evidence was offered on the trial tending to show that the break had any connection with the accident, which occurred in an attempt by deceased to put a belt onto such pulley, the mere admission of the pulley in evidence, even if error, was not prejudicial.

7. Where the questions of a special verdict fully cover the issues and are unobjectionable in form, the refusal of the court to submit other questions is not error.

APPEAL from a judgment of the circuit court for Manitowoc county: MICHAEL KIRWAN, Circuit Judge. *Affirmed.*

The plaintiff sues for the death of her husband, who was killed while in the employ of the defendant, January 12, 1912, by being caught and whirled around one of the main line shafts in the defendant's shop at Manitowoc. The negligence charged is that the shaft had no guard. The deceased was a carpenter, thirty years of age, earning about $70 a month. The accident happened in the afternoon in the punch room of the factory. This room is about fifteen feet five inches in height. The line shaft on which the intestate was killed runs through the room from east to west, thirteen feet ten inches above the floor, and about two feet from the north side of the room. Upon this shaft is a wooden pulley twelve inches in diameter and ten inches wide, on which a four-inch belt runs south and slightly upward to a short countershaft, five feet three inches distant. From this countershaft a smaller belt runs eastward and slightly downward to a pulley

which operates a countersink machine. On the countershaft
there is a loose pulley at the west end, and a tight pulley next
to it eastward. When the countersink machine is not in use
the belt from the main shaft runs on the loose pulley, but
when it is desired to operate the countersink machine the belt
is shifted to the tight pulley by means of a belt shifter. The
belt shifter was a square wooden bar, two by two inches in
size, running in wooden guides, and located horizontally about
one foot and three inches north of the center of the counter-
shaft, and operated from the floor below by a lever or handle
projecting downward from the east end thereof. The belt
shifter was four feet distant from the main shaft and parallel
to it, but a few inches higher from the floor. There was a
sort of a staging ten feet above the floor, consisting of two
long, heavy planks, running substantially east and west, and
a shorter plank crossing them. This staging was between
the countershaft and the main shaft, and, while not appar-
ently of permanent construction, had remained there for
some years, and was used by employees when necessary to re-
pair or renew the belts or pulleys at this place. There was
no guard on either the main shaft or the countershaft.

On the day of the accident Nickels, the deceased, was sent
by his foreman, Hendries, to place a new tight pulley on the
countershaft in place of the old one. The main shaft was
in motion as usual. Nickels was told to "put the pulley on
the shaft so as to have it ready in case they wanted to use the
machine, everything completed." The belt was then lying on
the loose pulley of the countershaft and on the main shaft
west of the pulley. Nickels went upon the staging and at-
tempted to do the work required, but found that he needed
additional materials, and went down and reported to Hen-
dries, who gave him a piece of rubber belting for use in fast-
ening the pulley. Nickels then returned to the work and
succeeded in fastening the pulley to the countershaft. No
one saw the accident, but it appears that in some way Nick-

els's jumper was caught and wound around the main shaft, and he was horribly mangled before the machinery could be stopped. The belt was found east of the pulley on the main shaft, and the nearest point of Nickels's body was eighteen inches east of the same pulley.

The jury returned the following special verdict:

"(1) Was the unguarded shaft by which plaintiff's intestate, Herman Nickels, deceased, was caught and killed, so located as to be dangerous to him in discharging the duty of his employment which he was performing at the time when he was killed? *A.* Yes.

"(2) If your answer to the first question be 'Yes,' then answer this: In leaving said shaft without a guard and without a fence, did defendant fail to exercise ordinary care? *A.* Yes.

"(3) If the first question be answered 'Yes,' then answer this: Was defendant's failure to guard or fence said shaft the proximate cause of the death of Herman Nickels? *A.* Yes.

"(4) Was there on the part of Herman Nickels any want of ordinary care which contributed to cause his death? *A.* No.

"(5) If the court shall be of the opinion that plaintiff is entitled to judgment in her favor, what sum will fairly and reasonably compensate *Mary Nickels,* the widow of said deceased, for the pecuniary injury to her resulting from his death? *A.* Five thousand eight hundred sixteen ($5,816) dollars."

From judgment for the plaintiff on this verdict the defendant appeals.

For the appellant there was a brief by *Nash & Nash* and *Doe & Ballhorn,* and oral argument by *J. B. Doe.* They contended, *inter alia,* that there was in the case neither an element of reasonable anticipation of injury on the part of the employer nor sufficient evidence to remove the cause of the accident from the realm of conjecture, citing *Kruck v. Wilbur L. Co.* 148 Wis. 76, 133 N. W. 1117; *West v. Bayfield M. Co.* 144 Wis. 106, 128 N. W. 992; *Willette v. Rhine-*

*lander P. Co.* 145 Wis. 537, 130 N. W. 853; *Bandekow v. C., B. & Q. R. Co.* 136 Wis. 341, 117 N. W. 812; *Rahles v. J. Thompson & Sons Mfg. Co.* 137 Wis. 506, 118 N. W. 350, 119 N. W. 289; *Schmitt v. Seefeld,* 139 Wis. 459, 121 N. W. 136; *Glenesky v. Kimberly & C. Co.* 140 Wis. 52, 121 N. W. 893; *Schiefelbein v. Badger P. Co.* 101 Wis. 402, 77 N. W. 742; *Hamann v. Milwaukee B. Co.* 127 Wis. 550, 106 N. W. 1081; *Hart v. Neillsville,* 141 Wis. 3, 123 N. W. 125; *Houg v. Girard L. Co.* 144 Wis. 337, 129 N. W. 633; *Schell v. C. & N. W. R. Co.* 134 Wis. 142, 113 N. W. 657; *Schultz v. C., M. & St. P. R. Co.* 116 Wis. 31, 92 N. W. 377; *Koutsky v. Forster-Whitman L. Co.* 146 Wis. 425, 131 N. W. 1001; *Musbach v. Wis. C. Co.* 108 Wis. 57, 84 N. W. 36; *Law v. American B. Co.* 147 Wis. 224, 132 N. W. 593; *Sorenson v. Menasha P. & P. Co.* 56 Wis. 338, 14 N. W. 446; *Morrison v. Phillips & C. C. Co.* 44 Wis. 405; *Beyersdorf v. Cream City S. & D. Co.* 109 Wis. 456, 84 N. W. 860; *Chybowski v. Bucyrus Co.* 127 Wis. 332, 106 N. W. 833.

For the respondent there were briefs by *Hougen & Brady,* attorneys, and *Martin, Martin & Martin,* of counsel, and oral argument by *P. H. Martin.* They cited, among other authorities, *Muenchow v. Theo. Zschetzsche & Son Co.* 113 Wis. 8, 88 N. W. 909; *Graves v. Rib Lake L. Co.* 151 Wis. 99, 138 N. W. 86; *Koch v. Wis. P. C. Co.* 152 Wis. 488, 140 N. W. 37; *Miller v. Kimberly & C. Co.* 137 Wis. 138, 118 N. W. 536; *Monahan v. Fairbanks-Morse Mfg. Co.* 147 Wis. 104, 132 N. W. 983; *Monaghan v. Northwestern F. Co.* 140 Wis. 457, 122 N. W. 1066; *McGinnis v. Northern P. Mills,* 147 Wis. 185, 132 N. W. 897, 133 N. W. 22; *Chopin v. Combined Locks P. Co.* 134 Wis. 35, 114 N. W. 95.

Winslow, C. J. Numerous assignments of error are made, many of which will not be discussed in this opinion, but it is not to be understood therefrom that all have not received attention.

The general claim is made that the evidence was over-whelming that it was not usual or customary to guard main shafting situated as the shafting was in this case, and hence that sec. 1636$j$ of the Statutes does not cover the case under the rule approved in *West v. Bayfield M. Co.* 144 Wis. 106, 128 N. W. 992. There was undoubtedly much testimony tending to show that line shafting of the same general nature in other shops is not usually guarded, but the difficulty is that much of that testimony related to line shafting which employees were not expected to approach in the course of their duties while in motion. In the present case the evidence quite satisfactorily showed that the employees of the defendant were expected and required to ascend upon the staging and work at times in close proximity to this line shaft while it was in motion. The statute requires the guarding of all shafting so located as to be dangerous to employees in the discharge of their duty. In shops where no duty called an employee to the vicinity of a moving shaft, it may well be that the statute imposes no duty to guard it, but the fact that such shafts are not generally guarded would cast no light on the question of the duty to guard a shaft near which employees are required to work while it is in motion. There was plenary evidence that the shaft in question here was such a shaft, hence the evidence of custom above referred to had little weight and certainly was not controlling.

Some detail errors assigned will be given brief notice.

An employee of the defendant, named Nuhs, was called by the plaintiff as an adverse witness, and upon objection by the plaintiff the defendant's counsel was not allowed to cross-examine him. This was error under the ruling in *Guse v. Power & M. M. Co.* 151 Wis. 400, 139 N. W. 195. However, it does not appear that the error was in any respect prejudicial. The witness was called almost at the close of the plaintiff's case, and the defendant could easily have put him on the stand as a witness for the defense within a few moments after

his examination as an adverse witness ceased, but did not choose to do so. We see no reason to suppose that the refusal to allow cross-examination prejudiced the defendant's case in any way.

No one saw the accident, and certain shop employees who were called as witnesses for the plaintiff were allowed to state how they would go to work to put the belt on the pulley on the main shaft, and how it was usually done, the plaintiff's theory being that the deceased had concluded his work of putting the new tight pulley on the countershaft, and had crossed over on the staging to the immediate proximity of the main shaft, and was attempting to put the belt onto the pulley on the main shaft when his jumper was caught by the shaft itself. These questions were objected to, and error is assigned on the overruling of the objections, but we see no good ground for complaint. The question for the jury was whether the plaintiff was caught while endeavoring to perform his duty. If a witness had seen him trying to put the belt on when his clothing was caught, he could have testified to the fact. No one having seen him, it was certainly competent to show that in the ordinary course of an attempt to put the belt on he would be brought in close proximity to the shaft, where his clothing would be likely to be caught. As the ordinary method of putting a belt on under such circumstances is not matter of common knowledge, no reason is perceived why those who had what may be called expert knowledge on the subject could not testify to it. The foreman, Hendries, after testifying that the belt was always put on at this place when the main shaft was in motion, was allowed to answer against objection that he expected Nickels would do it that way when he sent him up there. This ruling is assigned as error, but we see none. If the belt was always put on that way, and the foreman gave no instructions to do the task in any different manner on this occasion, it would seem that not only the foreman but Nickels himself would necessarily expect that

it would be done in the usual and customary way. In any event, no prejudice could result from the ruling.

The pulley on the main shaft had a break on the edge, and this break was alleged in the complaint to be one of the causes of the accident. On the trial, however, there was no evidence tending to show that the break had any connection with the accident. The plaintiff, however, was allowed to introduce the pulley in evidence, and this ruling is alleged to be error. It does not appear that any comment was made on the condition of the pulley, or any argument based thereon. Doubtless the court would have instructed the jury that the break was not to be in any way considered had he been requested to do so, but he was not. It is clear that this was a part of the machinery about which the deceased was at work when the accident happened. No intelligent juryman could have supposed under the state of the evidence that the break in question had anything to do with the death of the deceased, and we are unable to see how the introduction of the pulley in evidence could have been prejudicial in any event, even if it were conceded to have been improperly admitted.

Fault is found with the questions submitted to the jury, as well as with the rulings of the court refusing to submit certain other questions proposed by the defendant, but we are well satisfied that the questions actually submitted fully cover the issues and are not objectionable in form. Complaint is also made of the charge, but it seems on examination to have very carefully guarded the defendant's rights and to include all the substantial propositions necessary to be placed before the jury to enable them to properly understand the questions and the law applicable to them.

On the whole, the case seems to have been tried with conspicuous fairness and care. There was ample ground for the inference drawn by the jury that the deceased met his death while attempting to put the belt on the main shaft pulley, after completing his work on the countershaft, and thus carry

out his instructions to have everything in readiness for the operation of the countersink machine.

Few cases depending on inferences from circumstances are more satisfactorily proven than the present. We discover no prejudicial error in the record.

*By the Court.*—Judgment affirmed.