ADAMS, Respondent, vs. THE BUCYRUS COMPANY, Appellant.

*October 29—November 18, 1913.*

*Adverse witnesses: Cross-examination: Impeachment: Appeal: Prejudicial errors: Master and servant: Injury to employee: Negligence: Res ipsa loquitur: Evidence: Competency: Loss of sexual power: Damages: Services of wife as nurse: Excessive award.*

1. Where plaintiff has called and examined an employee of defendant as an adverse witness under sec. 4068, Stats., defendant has a right to re-examine such witness as to all matters tending to explain or qualify the testimony already given, though not as to new defensive matters, and may also ask the witness

questions proper for the purpose of impeachment, upon stating that he does not intend thereafter to make the witness his own.

2. Where such right is refused, the question on appeal is whether the error was so materially harmful that, had it not occurred, the result might probably have been different.

3. Where the witness so examined was the sole eye-witness of the accident in which plaintiff was injured, and immediately after such accident had made statements in writing which conflicted with his testimony in important particulars, and by the ruling of the court defendant is debarred from making use of such conflicting statements, the error should work a reversal.

4. In an action to recover for personal injuries caused by the fall of a steel roller forty-two inches in diameter, with a fifteen-inch face, and weighing two tons, which had been left standing upright upon such face on a sand floor, the doctrine of *res ipsa loquitur* is *held* not to apply, since it cannot be said, under the evidence, that the fall of the roller must necessarily have been caused either by a defect in the floor or by negligence in placing the roller itself.

5. Where plaintiff introduced evidence to support the theory that the fall of the roller was caused by vibrations of the earth resulting from the operation of a heavy drop for breaking castings, located about one hundred feet away, it was error to exclude evidence offered by defendant of experiments made with such drop and the fact that a pair of delicate scales attached to a brick wall about fifty feet away were not affected thereby.

6. Where no direct evidence can be adduced as to a loss of sexual potency resulting from a personal injury, the admission of conjectural evidence on the subject is error.

7. In an action for personal injuries, a reasonable sum for the services of plaintiff's wife in nursing him, not exceeding the amount for which plaintiff could have employed others to do the work, is a proper item of damages.

8. Plaintiff, earning from $90 to $95 per month, was so injured by the fall of a heavy roller upon him that he will never again be able to walk freely, or do heavy lifting or stooping, but will probably be able to walk with a cane and do many kinds of light work. At one time after his injury he had employment in which he earned $45 per month. *Held*, that an award of $18,300 was excessive, and that any award exceeding $12,000 should not be sustained.

APPEAL from a judgment of the circuit court for Milwaukee county: OSCAR M. FRITZ, Circuit Judge. *Reversed.*

Personal injuries. The plaintiff, a millwright, nearly

forty years of age, was in the employ of defendant at its large manufacturing plant at South Milwaukee, and was very seriously injured February 3, 1911, by reason of a large roller falling upon him. The roller was in the shape of a solid wheel, forty-two inches in diameter, fifteen and one-half inches thick, made of semi-steel, and weighing nearly 4,000 pounds. The roller was a part of the machinery of a so-called sand mill or sand mixer, which was situated in the foundry annex of the defendant's plant and was used for mixing moulding sand. There are two sand mixers in the annex and each contains two of these large steel rolls, which revolve in a large pan, eight feet in diameter, into which the sand is thrown. The pan revolves horizontally and the wheels vertically, and the sand is thus thoroughly mixed. The rolls revolve on a shaft which runs through the middle, like the axle of a wheel, and the aperture through which this shaft runs is about six inches in diameter. The rolls become worn in time, and sometimes the metal bushings in the aperture, which serve to reduce the aperture to the size of the shaft, have to be replaced. Two days before the accident *Adams* with his helper, one Ranthum, was directed by Beck (his foreman) to put new bushings in the apertures of the rolls belonging to one of the sand mixers. The rolls had then been removed from the machine and were standing on their fifteen-inch rims or edges on the sand floor of the annex near the mixer. Plaintiff and Ranthum drove in bushings on one side of each of the rolls with a sixteen-pound sledge. The bushings were bands of iron which fitted closely in the aperture and reduced the size thereof from about six inches to about three inches, and were about six inches in length. They fitted very closely, and it was necessary to spend some time driving in each bushing, a block of wood being placed against the outer end of the bushing and struck repeatedly by the sledge. It took about four hours to put the bushings in one side of each roller, and plaintiff then tried to fit the

bushings into the apertures on the other sides of the rollers and found them too small. Plaintiff informed Beck, the foreman, of the fact and gave Beck the measurements of the hole, and Beck promised to have larger ones made. No work was done on the rollers the next day. In the evening of the last named day one Pfeiffer, who was a sand mixer on the night force, found the rollers in his way as he wheeled sand to 'the other sand machine, and he asked the man who operated the electric crane to move them away with the crane, which he did, placing them four or five feet to the south of their former positions, one being left about two feet from the concrete foundation of an iron column on the east side of the annex, and the other four or five feet west thereof, and both standing on their rims or edges, as before. On the following day, at about 9:30 a. m., plaintiff and Ranthum were sent back to complete their work on the rollers with the new bushings. They drove one of the new bushings about two inches into one of the rollers, when it seemed to hit a burr and stopped. Ranthum then went on the other side and drove the bushing out. Plaintiff got down on his hands and knees with a candle and looked in the hole to see what the obstruction was. While he was doing this Ranthum (as he testifies) took the other bushing and tried it in the aperture of the roller which stood near the column and tapped it lightly with the machinist's hammer, whereupon (according to Ranthum's testimony) the roll rolled a little northward and tipped over westward on to the plaintiff as he was kneeling, thus crushing him to the ground and inflicting very serious and permanent injuries. No one saw the roll fall except Ranthum.

The jury returned the following special verdict:

"(1) Was the plaintiff injured on February 3, 1911, by an iron roller falling upon him in the foundry annex of the defendant? *A.* (by the court). Yes.

"(2) Was the place where the plaintiff was at work when injured, reasonably safe considering the condition of the

material underneath the roller, which fell on him, the position and character of that roller and the nature of the work in hand?    *A.* No.

"(3) If you answer the second question 'No,' then answer this question: Did the defendant know in time to have prevented the injury to plaintiff that the place where he was at work was not reasonably safe?    *A.* Yes.

"(4) If you answer the third question 'No,' then answer this question: Ought the defendant, in the exercise of ordinary care, to have known in time to have prevented the injury to plaintiff that the place where he was at work was not reasonably safe?    *A.* Yes.

"(5) If you answer the second question 'No,' then answer this question: Was such failure to provide a reasonably safe place for the plaintiff to work in, the proximate cause of his injury?    *A.* Yes.

"(6) If you answer the second question 'No,' then answer this question: Ought the plaintiff, in the exercise of ordinary care, to have known that the place in which he was working at the time of the injury was not reasonably safe?    *A.* No.

"(7) Did any want of ordinary care on the part of the plaintiff proximately contribute to produce his injuries?    *A.* No.

"(8) Was Emil Ranthum guilty of negligence in his attempting to put the bushing in the roller that fell on the plaintiff?    *A.* No.

"(9) If you answer the eighth question 'Yes,' then answer this question: Was such negligence on the part of Emil Ranthum the proximate cause of plaintiff's injury?    *A.* No.

"(10) What sum will reasonably compensate the plaintiff for the damage sustained by him as a result of his injury?    *A.* $18,300."

The court overruled defendant's motions to change certain answers and for judgment, and entered judgment on the verdict for the plaintiff, from which judgment defendant appeals.

For the appellant there were briefs by *Doe & Ballhorn,* attorneys, and *W. C. Quarles,* of counsel, and oral argument by *Mr. Quarles* and *Mr. J. B. Doe.*

*J. H. Stover* and *J. S. Stover,* for the respondent.

WINSLOW, C. J.   In this case the plaintiff called as adverse witnesses a number of the defendant's employees, including Ranthum, the plaintiff's helper, and examined them fully as to the situation and the circumstances surrounding the accident.   Ranthum gave his story of the falling of the roller at length.   The trial took place in November, 1912, and the trial judge ruled in accordance with the rule apparently laid down in *O'Day v. Meyers,* 147 Wis. 549, 133 N. W. 605, that the defendant could not cross-examine Ranthum or any of the other witnesses who were employees of the defendant and were called as adverse witnesses.   This was error under the decision in *Guse v. Power & M. M. Co.* 151 Wis. 400, 139 N. W. 195, which case, however, was not decided until December, 1912.   In this latter case it was held that the defendant has a right to re-examine such a witness immediately after the close of the plaintiff's examination as to all matters tending to explain or qualify the testimony already given, but not as to defensive matters not brought out by plaintiff's counsel, and may ask the witness questions proper for the purpose of impeachment, upon stating that he does not intend thereafter to make the witness his own.

The question is whether such error was reversible error, *i. e.* does it appear that it affected the substantial rights of the appellant (sec. 3072m, Stats. 1911), or, to express the thought in other language, does it appear affirmatively that the error not only harmed the appellant, but harmed him so materially that it might probably have changed the result of the case?   *Koepp v. Nat. E. & S. Co.* 151 Wis. 302, 139 N. W. 179.   In several cases this precise error has been held nonprejudicial under the circumstances present in those particular cases.   *Jakopac v. Newport M. Co.* 153 Wis. 176, 140 N. W. 1060; *Baermann v. Chicago & M. E. R. Co.* 153 Wis. 235, 140 N. W. 1119; *Nickels v. Manitowoc S. & D. D. Co.* 153 Wis. 298, 141 N. W. 269.

We are unable, however, to reach that conclusion in the present case, at least in respect to the examination of the wit-

ness Ranthum, who was the only eye-witness of the fall of the roll.    The plaintiff himself did not know nor see what struck him.    So the testimony of Ranthum was of the greatest importance in the case.    Upon his credibility much depended.    He testified, on his examination as an adverse witness, that the sand was eight or ten inches deep where the roller stood when it fell over; that the place where it was standing was about eight inches higher than the place where *Adams* was kneeling down; that the sand that was about eight or ten inches deep extended about five feet into the room from the wall, that it declined a little from the wall,—it was gradually down from where it was eight or ten inches deep to where there was practically no sand towards the west from the wall (this was towards *Adams*); that he (Ranthum) was trying the bushing in the roller that fell over to see whether it would fit; that the stone moved a little—"a little roll like"—toward the north and then tipped over westward toward *Adams,* and made a furrow with its edge fifteen or eighteen inches long in the sand.    On examination by the defendant, when called as a witness for the defendant, he stated that when he was trying the bushing he tapped it lightly with a machinist's hammer twice, and that then the roller moved and tipped.    The natural conclusion from this evidence seems to be that the roll was standing on a sloping surface of sand several inches deep, and standing so insecurely that a slight tap with a machinist's hammer caused it to topple over. The defendant offered to show, however, that Ranthum had previously made three written statements as to the facts which differed very materially from his statements on the witness stand.    In the first of these statements, made on the day of the accident, he appears to have said:

"I was working on one roller and *John Adams* on the other; I was driving in the bushing with a light sledge, and all at once the roller fell over and struck *Adams* across the back; it was impossible to have the rollers in a better position

as they were placed solid, and from my point of view could not tip."

In the second signed statement, made May 1st following, he appears to have said:

"The floor on which the rollers stood was made of sand and was level, without any holes in it. . . . . The floor was so level that it is all a man can do to roll them' (the rollers), consequently blocks are not necessary. . . . . I was driving in the bushing in the roller with a sledge when my roller tipped over on *Adams.*"

In the third statement, made November 7, 1912, he appears to have said:

"The higher part of the floor on which the rollers were placed was solid as far as I could see. They wheeled wheelbarrows over it and the tracks of the wheels did not show. The foot marks did not show on the sand. As far as I could see and as far as I know the floor where the rollers were placed (the higher part) was solid. It was level."

The defendant was absolutely debarred from examining Ranthum when called as an adverse witness by the plaintiff, and was thus denied the right which it had to lay the foundation for the introduction of these statements as evidence impeaching his credibility. When the defendant took the case it examined Ranthum as its own witness, but on offering to introduce the written statements they were ruled out. This latter ruling was abstractly correct under the general rule that a party cannot impeach his own witness, but the net result of the two rulings was to exclude the statements completely from the case, when the defendant had the right to have the jury consider them as impeaching Ranthum's credibility, and the defendant had made every effort in season and out of season to get them in.

Were this the case of a minor witness or a minor fact we might well conclude that we could not say affirmatively that there had been prejudice to a substantial right, but here is

the only witness in the case who actually knows what hap-
pened.   He practically states upon the trial that the falling
roll stood on several inches of sloping sand and that the
merest touch tipped it over, and it seems that the jury must
have believed this evidence in order to return the verdict
which they did.   Immediately after the accident, however,
he stated in writing that the floor was level and solid, and
that he was driving the bushing in with a sledge when the
roller tipped over.   If these positive statements, utterly at
variance with his present testimony and made by the wit-
ness when the transaction was fresh, had been placed before
the jury, it seems to us that it can hardly be doubted that
the result of the case might very probably have been differ-
ent.

We do not regard the case as a case to which the doctrine
of *res ipsa loquitur* applies.   It could not be called negli-
gence as a matter of law to have a sand floor in a room of
this kind, nor to have the roller standing on sand, nor can one
say that the fall of the roller must necessarily have resulted
from any defect in the floor, nor in the placing of it.   If the
roller was slightly inclined when Ranthum began to fit the
bushing in the hole, we cannot say that a very moderate
amount of striking on the bushing might not so disintegrate
the sand and cause it to slip away under the opposite edge
of the roller as to produce the result which actually was
produced by *some* agency in the present case.   In a word, we
do not feel that we can say that the roller must have fallen
either because the floor was negligently constructed or the
roller itself negligently placed.

This conclusion necessitates reversal and new trial.   A
number of other errors are assigned by the appellant, some
of which will be briefly treated.   Those which are not treated
must be considered as overruled.   We should be slow to
reverse the judgment on account of any of them standing by
themselves.

At the time of the accident there was located outside of the annex, at a distance of about 125 feet, an apparatus known as a foundry drop, used for breaking up castings. It consisted of a heavy metal bulb which was raised forty feet or more from the ground and dropped upon the casting which was to be broken. There was some testimony to the effect that when the drop was in use one could feel the jar in the ground at the sand mixers. The object of the introduction of this evidence by the plaintiff was to justify the idea or conclusion that the jar or vibration of the ground caused by the foundry drop might have caused a vibration of the sand under the west side of the roller and resulting in a movement of loose sand out from under the roller. In order to meet this inference of fact, the defendant offered to prove the results of an experiment made at about the time of the trial with a pair of delicate scales located in the chemical laboratory of the works about fifty feet from the drop. These scales stood on an oak bench built into the wall of the building, which wall rested on a concrete foundation resting on the ground, and they record a weight of 1-560 of an ounce, and are so delicate that any slight jar upon the bench would appreciably disturb the balance. The offer was to show that the foundry drop was operated while the witnesses called were watching the scales, and that the scales were not in the least affected. There was also an offer to show by the person who had operated the scales for several years that they never had been affected by the drop in the slightest degree. This testimony was all ruled out, and, as it seems to us, erroneously. The scales were about half as far from the drop as the roller and were shown to be directly connected with a solid wall standing upon the ground. Common knowledge tells us that any appreciable tremor in the ground is communicated to a wall standing thereon, and that it must necessarily affect the balance of such delicate scales as the scales in question.

Two physicians were examined as experts, and while neither of them could say that in his opinion the plaintiff's sexual potency was affected, one was allowed to testify that the plaintiff had told him that such was the case, and the other was examined at length as to the location of the nerves controlling the sexual powers with reference to the injuries received by the plaintiff. It seems that it was purely conjectural whether there was any injury to the sexual powers at all. If there was such injury, it is at best but a single element in the general condition of physical enfeeblement resulting from the injury. It is proper to be shown, undoubtedly, where direct evidence can be adduced to show it, but the danger that the jury will consider it as a separate element of damage and thus duplicate damages is so great that this court has twice referred to and disapproved of conjectural evidence of this nature. *Bucher v. Wis. Cent. R. Co.* 139 Wis. 597, 120 N. W. 518; *Krawiecki v. Kieckhefer B. Co.* 151 Wis. 176, 138 N. W. 710. Attention is called to the rule laid down in these decisions, in case of another trial of this case.

The general claims are made by the defendant that the evidence shows as matter of law that there was no negligence by the defendant and that the plaintiff not only assumed the risk but was guilty of contributory negligence. These contentions are all overruled, and it is not deemed necessary to discuss them.

The charge of the court permitted the jury to allow a reasonable sum for the services of plaintiff's wife in nursing him, not exceeding the amount for which plaintiff could have employed others to do the work. This ruling is assigned as error, but we do not find it to be erroneous. It is in accord with the decisions of this court in *Crouse v. C. & N. W. R. Co.* 102 Wis. 196, 78 N. W. 446, 778, and *Johnson v. St. Paul & W. C. Co.* 131 Wis. 627, 111 N. W. 722, nor is the

doctrine of these cases changed by the case of *Milwaukee v. Miller,* 154 Wis. 652, 144 N. W. 188.

We regard the damages awarded by the jury as excessive. The plaintiff was earning at the time of his injury thirty cents an hour for a ten-hour day, and sometimes worked overtime. He thought he averaged $90 to $95 per month. He walks now with crutches, will never be able to walk freely, nor do heavy lifting or stooping, or work requiring dexterity, but will probably be able to walk with a cane and do many kinds of light work. During the summer of 1912 he had employment at the public bathhouse in Bayview as attendant, giving out keys of lockers, and earned $45 per month. Without going into the matter in detail, we hold that under the present evidence a verdict exceeding $12,000 should not be sustained.

*By the Court.*—Judgment reversed, and action remanded for a new trial.

BARNES, J., dissents.