EMBERG, Appellant, vs. GREAT NORTHERN RAILWAY COMPANY, Respondent.

*February 4—March 17, 1914.*

*Railroads: Injury to switchman: Unsafe place: Switch stand near track: Custom: Instructions to jury.*

1. If an appliance or place of work is obviously dangerous, not even a general custom—much less, a few exceptional cases—will absolve the master from liability for an injury to a servant.
2. In an action by a switchman for injuries sustained by collision with a switch stand while he was climbing the ladder of a box car, the jury answered affirmatively a question as to whether it was customary for railroad companies having switch yards in that vicinity to locate switch stands for uses similar to those of the stand in question as close to the tracks as that stand was located. The court had instructed that this question did not inquire as to whether or not it was customary for the defendant and other railroad companies having switching yards in that vicinity to locate all switch stands of the kind and intended for similar uses as this one at the distance from the rail mentioned, but only as to whether or not it was customary for such companies, in the ordinary course of their

business, to locate some such switch stands at such distance from the rail. *Held*, that the instruction was erroneous and prejudicial because it permitted or required the jury to answer in the affirmative if some railroad companies, in the ordinary course of their business, located some such switch stands—no matter how few so there were more than one—at that distance from the rail.

BARNES and MARSHALL, JJ., dissent.

APPEAL from a judgment of the circuit court for Douglas county: FRANK A. Ross, Circuit Judge. *Reversed.*

*W. P. Crawford,* for the appellant.

*J. A. Murphy,* for the respondent.

TIMLIN, J. In this action by a switchman against his employer for personal injuries sustained by collision with a switch stand, there were several charges of negligence in the complaint. Among them was one tendering an issue by averring the existence of a custom of placing switch stands farther from the railroad track than the switch stand upon which plaintiff was injured, which custom was known to defendant and which defendant negligently failed to observe. The jury by special verdict found the defendant guilty of want of ordinary care proximately contributing to produce plaintiff's injury by maintaining the switch stand with which plaintiff collided as it was maintained with reference to the railroad track. But the jury also found that it was customary for railroad companies having switch yards in that vicinity to locate switch stands for similar uses as close to the track as the switch stand in question. They also acquitted the plaintiff of contributory negligence. The learned circuit court changed the first answer of the jury so as to find that the defendant was not guilty of any want of ordinary care in maintaining the switch stand as it was, and allowed the other answers of the jury to stand and gave judgment for the defendant, dismissing the complaint.

It will not be necessary to notice any other assignment of

error except that relating to the instruction given with reference to the second question of the special verdict. This instruction was as follows:

"This question of course does not inquire as to whether or not it was customary for the defendant and other railroad companies having switching yards in this vicinity to locate all switch stands of the kind and intended for similar uses as this one at the distance from the rail mentioned, but only as to whether or not it was customary for such companies, in the ordinary course of their business, to locate some such switch stands at such distance from the rail."

This instruction apparently authorized the jury to answer the second question in the affirmative in case they found that it was customary for some railroad companies having switch yards in the vicinity to locate some such switch stands at the same distance from the nearest rail; that is to say, if a railroad company had one thousand switch stands of the kind in question and two were located at this distance from the rail although the customary distance as to all others was much greater, the jury nevertheless should answer the question in the affirmative. When we reflect that the real inquiry was not with reference to exceptional cases, the erroneous character of this instruction becomes apparent. If an appliance or place of work is obviously dangerous, even a general custom will not absolve the master from liability. *Nickels v. Manitowoc S. & D. D. Co.* 153 Wis. 298, 303, 141 N. W. 269; ch. 485, Laws of 1911; secs. 2394—48, 2394—49, Stats. Much less would a few exceptional cases.

It is true switch stands of a particular make or for some special purpose may be located nearer to the track than others, but that does not authorize proving a custom or manner of construction by two or three instances out of a great number, if in the case under investigation and in these two or three instances the switch stand was so close to the track that a switchman boarding a moving car at night might, in the exercise of ordinary care, collide with the switch stand. We

think the second question of the verdict was properly submitted to the jury because an issue on this point was tendered by the complaint, but that the instruction above quoted was erroneous and prejudicial, not because it failed to include all switch stands of the kind and intended for similar uses as the switch stand in question, but because it permitted or required the jury to answer this second question in the affirmative if some railroad companies, in the ordinary course of their business, located some such switch stands—no matter how few so there were more than one—at this distance from the rail.

Before taking up the trial of this case again it would be well for counsel to carefully read the decisions of the federal courts upon the scope and effect of the federal Employer's Liability Act, which seems to be covered by the complaint and to have been disregarded on the trial.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

BARNES, J. (*dissenting*). This court has endeavored to give effect to sec. 3072m, Stats., so as to carry out the purpose which it is conceived the legislature had in mind in passing it. In the numerous cases where that statute has been invoked, technical errors have been disregarded and judgments have been reversed only where it was believed that the error complained of might and probably did result in prejudice to the appellant. It will, I am sure, be taken as a truism by every one that the statute is general in its application and that plaintiffs in personal injury actions are no more immune from the operation of the law than are defendants in such actions. Courts endeavor as they should to enforce the law equally as to all, albeit they may not always accomplish the ideal. From my reading of the evidence in this case I cannot think that there is even a remote possibility that the error complained of harmed the plaintiff or had any effect on

the jury in answering the second question in the special ver-
dict.

The error consisted in using the word "some" in the in-
struction quoted in the opinion of the court.   The question
and answer were as follows:

"(2) Was it customary for railroad companies having
switch yards in this vicinity to locate switch stands for uses
similar to those of switch No. 49 as close to the tracks as
switch No. 49 was located?   A. Yes."

It is said in the opinion that the jury might have answered
the question as it did if the evidence showed that a railroad
company had one thousand switch stands and two of them
were located as close to the track as was the one which in-
jured the plaintiff.

The evidence showed that the base of the switch stand
which injured the plaintiff was four feet and six inches from
the outside of the rail, and that the clearance was four feet
three inches.   The defendant offered no evidence to show
that this distance was the customary and usual one as to a
few of its yard switches or as to a few dozen of them or as
to a few hundred of them.   It did not offer a shred of testi-
mony in relation to isolated cases except as will be hereafter
noted.   The testimony of its witnesses further showed that it
used three practically uniform standards and that such stand-
ards were the ones that were commonly in use by railroad
companies generally.   Crown or stub switches usually have
a clearance of three feet three inches.   These switches have
no upright arm, so they could not injure a man riding on the
side of a box car.   The standard switch for use in yards, as
above stated, has a clearance of four feet three inches be-
tween the switch standard and the rail at the nearest point.
The third class of switches is what is known as main-line
switches, and the clearance between the nearest point of these
switches and the outside of the rail on the Great Northern
road is five feet three inches.   We are not particularly con-

cerned with either the main-line switch or the stub switch in this case. Now the yard switches, according to the testimony of the defendant, which are not built in accordance with this standard, are those on curves and where the character of the ground is such that the switch cannot be placed at this distance. The testimony showed, for instance, that as to switch No. 50, which was on a curve, the distance was one foot greater than the standard distance. The reason for this is of course obvious,—the clearance at either end of a car might not be as great as if the track were straight. Switch No. 43 was also a foot further from the rail than the standard distance, because if it were placed at the standard distance it would be in a culvert.

Mr. Donley, the general roadmaster of the *Great Northern Railway Company,* testified to these standards very fully, and furthermore that these standards are generally in use by the railroads of the country and that the clearance was the same; that the switch rods were interchangeable. He further testified that there were forty miles of track in the Great Northern yards at Superior, and the other evidence is to the effect that there were hundreds of switches in this yard.

Peter Jensen, the assistant roadmaster of the same road, testified to substantially the same state of facts. So did Flynn, the roadmaster of the defendant at Superior. So did Mealy, section foreman at Superior. O'Bevan, switchman for the defendant, testified to substantially the same state of facts. This witness further testified that he had worked in the Burlington yards, the Milwaukee yard at Chicago, and in the terminal yard at St. Louis; that while he didn't measure the distance the switches were from the track, in his judgment the distance was the same as in the Great Northern yard at Superior. Wedemeir, a member of the switching crew at the time plaintiff was injured, testified that he measured the clearance between the rail and switch No. 49, and he corroborates the testimony of the other witnesses. He further

testified that he observed the distance that various switches in various parts of the yard were from the track, and that this switch 49 was the same distance as the other switches generally throughout the various yards. Oliver, the night foreman, testified that the switches of the character of the one on which plaintiff was hurt were about the same distance from the track. Mehan, yardmaster of the Duluth, Missabe & Northern Railway Company, which operates a very large switching yard at or near Duluth, testified that the uniform distance of the switches in their yard from the nearest rail was four feet four inches, and that such switches were in general use in other yards. Also that the switch used by their company was a standard switch and in general use in that part of the country. Thompkins, yardmaster for the Terminal Company, which operates large switching yards in Superior, testified that there was a standard distance for switch stands in yards; that such standard distance was four feet six inches with a clearance of four feet three inches. He gave the same testimony in reference to stub switches and main-line switches that was given by the other witnesses referred to. Wells, general trainmaster for the Omaha road, testified that he had been in the railroad service for twenty-two years, worked for the Great Northern, Northern Pacific, Missouri Pacific, Union Pacific, Great Western, and Omaha roads, and that he had been in the Superior service about three years and was familiar with the switches in the yards and the distances from the same to the tracks on the various railroads generally; that all railroads have a standard uniform distance for switches from the rail; that he was familiar with switch 49 on the Great Northern and that it conformed to the standard generally in use on railroads where the same service was being done as was done by switch 49.

We now turn to plaintiff's evidence. The plaintiff himself testified that the customary distance to place switch stands

from the track at the head of the lakes was six feet.   Lapier said that the distance of high switch stands from railroad tracks in yards generally was five to six feet, and that switch 49 was closer to the track than other switches in the Great Northern yard.   Hoeffner testified that the standard distance was between five and six feet.   Vincent probably intended to testify to the same state of facts, although it appears quite satisfactorily from the evidence that his testimony related to main-line switches, principally at least.

All of this testimony was directed to the customary distance of placing switch stands from the rail in switching yards.   The court evidently was of the opinion that the testimony of the plaintiff and of the witnesses Lapier, Hoeffner, and Vincent raised an issue as to what the customary distance was, and hence submitted question 2 to the jury.   I think I have not overlooked any testimony of any importance bearing on the customary distance of locating switch stands from the nearest rail in switching yards.   The plaintiff, however, caused some measurements to be made of switches in a few isolated cases in some of the yards and had the witnesses who made the measurements testify.   The witnesses Gormley and Cressette measured four switches in the Great Northern yard, four in the yard of the Terminal Company, three in the Northern Pacific yard, two in the South Shore yard, two in the Soo yard, one at the crossing of the Great Northern and Northern Pacific, and also some switches in the Omaha yard, no data in reference to which are given. Vincent measured five switches in the yard of the Terminal Company and some in the South Shore yard, the number not being given.   Daoust measured five switches in the yard of the Duluth, Missabe & Northern Railway.   Some of these switches were unquestionably main-line switches, but it is difficult to tell how many.   The distance found varied from five feet six inches to seven feet one inch, with the exception

of one switch in the Great Northern yard, where the distance was found to be three feet eight and one-half inches; it does not appear whether this was a stub switch or not.

It will be observed that these measurements show that all of the switches measured, with one exception, were further from the rail than was switch 49, and further than the standard distance for yard switches as testified to by most of the witnesses.    If the testimony in reference to the measurements made of a few isolated switches, among the thousands in the Superior and Duluth yards, was material for any purpose, it was in connection with some general statements made that no difference was noticed between the switches measured and those which were not, so that such measurements indicated that the standard distance was greater than that testified to by the defendant's witnesses.    If it had any other possible bearing, it must have been to show a different standard from that testified to by defendant's witnesses and by some of the witnesses for the plaintiff.    By no possibility could this testimony be of any aid to the plaintiff in securing an affirmative answer to the second question, because in every single instance but one the distance testified to was greater than was the distance between switch 49 and the rail.

So .we have the evidence of defendant's witnesses and of some of plaintiff's as well, ten in number in all, that switch 49 was a standard switch placed at the usual and customary distance from the track for yard switches.    This evidence was given for the most part by men who either made actual measurements or who knew what the fact was.    It applied not to a few isolated switches, but to the hundreds if not thousands of switches in the yards of Superior and Duluth.    In the exceptional cases mentioned the switches were further from the rails.    We have the evidence of the plaintiff's witnesses that switch 49 was not placed the customary distance from the rail, because such distance was from five to six feet, and this raised the issue which the jury was called upon to

decide. There was no dispute as to how far switch 49 was from the rail. Aside from the evidence relating to the customary distance, there was the evidence referred to of measurements made of a few switches in several of the yards. That testimony could not benefit the defendant, because, except as to a single switch, the distances found were greater than the standard claimed by defendant. The defendant's whole defense rested on the proposition that there was a uniform standard for yard switches and that switch 49 belonged to that standard. There was abundant, in fact well nigh overwhelming, evidence to support this proposition. There was no evidence that switch 49 was in a small class by itself. Should this court say that the jury disbelieved the array of witnesses who testified in defendant's behalf on this point and answered the question as it did because of the court's instruction which had no substantial support in the evidence? What the court evidently intended to tell the jury was that it was not necessary that all switches should be placed at a uniform distance from the rail in order to warrant an affirmative answer to the second question.

I think that the instruction, looking at it from any viewpoint, was harmless and that the defendant was entitled to the benefit of the verdict and that the decision in this case is a backward step in the administration of the law.

It is very probable that under the facts shown in this case either party had the right to insist that the federal law was applicable to it. Neither party requested that it be tried under such law, and under the *Leora* and *Hanson Cases,* decided herewith, the right was waived as to the trial already had.

MARSHALL, J. I concur in the foregoing opinion of Mr. Justice BARNES.